UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TEVA PHARMACEUTICAL INDUSTRIES
LTD., TEVA PHARMACEUTICAL
WORKS PRIVATE LIMITED COMPANY,
AND TEVA PHARMACEUTICALS
CURACAO NV,

                Plaintiffs,

            v.

MERRILL LYNCH & CO., INC.,
MERRILL LYNCH, PIERCE, FENNER &
SMITH INC., AND MERRILL LYNCH
INTERNATIONAL,

                Defendants.

U.S. DISTRICT COURT
S.D.N.Y.

Case No. 09-CV-6936-NRB

**JURY TRIAL DEMANDED**

## FIRST AMENDED COMPLAINT

Teva Pharmaceutical Industries Ltd. ("Teva Ltd.") and its subsidiaries, Teva

Pharmaceutical Works Private Limited Company ("Teva-Hungary") and Teva Pharmaceuticals

Curacao NV ("Teva-Curacao," and, together with Teva Ltd. and Teva-Hungary, "Teva"), bring

this action against Merrill Lynch & Co., Inc. ("Merrill Lynch & Co."), Merrill Lynch, Pierce,

Fenner & Smith Inc. ("Merrill Lynch"), and Merrill Lynch International.  The allegations set

forth herein are based upon corporate knowledge and documents and information in Teva's

possession; upon investigation by Teva and by counsel that included a review of publicly

available documents, including administrative and legal actions brought against Merrill Lynch

and Merrill Lynch & Co., documents that appear to have been drafted in whole or in part by the

Defendants, Merrill Lynch & Co.'s press releases and filings with the Securities and Exchange

Commission ("SEC"), trial testimony from *United States v. Butler*, No. 08-CR-370 (JBW)

(E.D.N.Y.), news articles, and other publicly available materials; and upon information and

belief.

## PRELIMINARY STATEMENT

1.     This is an action to recover damages and for other relief resulting from Teva's purchase of approximately $273 million in auction rate securities that were underwritten by Merrill Lynch and Merrill Lynch International and marketed and sold to investors, including Teva, in connection with Merrill Lynch's and Merrill Lynch International's business of structuring, underwriting, and marketing Collateralized Debt Obligations ("CDOs").  As described more fully below, Teva has suffered staggering losses as a result of its purchase of CDO auction rate notes and other auction rate securities structured and underwritten by Merrill Lynch and Merrill Lynch International.[1]  Teva bought the Merrill Lynch Underwritten Securities in reliance on material omissions made, directly and indirectly, by Merrill Lynch and Merrill Lynch International.  In fact, the actual value of the Merrill Lynch Underwritten Securities that Teva purchased was substantially less than the approximately $273 million that Teva paid.  Teva purchased the Merrill Lynch Underwritten Securities based upon the market impact of an extensive pattern of deceptive and manipulative activities by Merrill Lynch in connection with the Dutch auctions for re-marketing of the Merrill Lynch Underwritten Securities.  As a result of these manipulative and deceptive activities, Teva believed that it could resell the Merrill Lynch Underwritten Securities, at par, in Dutch auctions conducted on pre-scheduled dates (monthly or

---

[1] Teva currently holds the following illiquid auction rate securities underwritten by Merrill Lynch (collectively, the "Merrill Lynch Underwritten Securities"):  Alesco Preferred Funding II, Ltd., CUSIP #01448AAB1; Athilon Capital Corp., CUSIP #047468AH6; Broderick CDO 1 Ltd., CUSIP #112021AE0; Cascade Funding CDO I, Ltd., CUSIP #147276AE9; Centre Square CDO, Ltd., CUSIP #156323AE7; Class V Funding II, Ltd., CUSIP #18272YAC2 and CUSIP #18272YAE8; Dekania CDO I, Ltd., CUSIP #244882AC0; Independence V CDO, Ltd., CUSIP #45343PAB1; Lakeside CDO I, Ltd., CUSIP #51210TAG0; Lakeside CDO II, Ltd., CUSIP #51210VAC4 and CUSIP #51210VAL4; Lenox CDO, Ltd., CUSIP #526257AA8 and CUSIP #526257AW0; Mantoloking CDO 2006-1, Ltd., CUSIP #564616AB6; Mercury CDO 2004-1, Ltd., CUSIP #58936RAC1; Pacific Bay CDO, CUSIP #69403UAB7; Port Jackson CDO 2007-1, Ltd., CUSIP #734524AB7; Reservoir Funding Ltd., CUSIP #76112CAC2; South Coast Funding IV Ltd., CUSIP #83743TAB0; Taberna Preferred Funding IV, Ltd., CUSIP #87330YAC7; TABS 2004-1, Ltd., CUSIP #87337PAC9; Vermeer Funding I, Ltd., CUSIP #92344VAB9; and Vermeer Funding II, Ltd., CUSIP #92343AAE0.

quarterly).  Teva also believed that an investment in these auction rate securities would be extremely safe and highly liquid, and have virtually no risk of loss of principal.

2.      Between January 2005 and August 2007, in reliance on the deceptive and manipulative conduct of Merrill Lynch described in this Amended Complaint, Teva purchased and then resold, in the aggregate, hundreds of millions of dollars in auction rate securities underwritten by Merrill Lynch and Merrill Lynch International, including the Merrill Lynch Underwritten Securities.  Teva believed that each of these securities would perform like a short-term, investment-grade debt security and would pay a market rate of interest for similar securities.  Teva also believed that these securities were highly liquid and could be sold at par, if not immediately, then in the periodic auctions.

3.      Merrill Lynch marketed, and knew that other broker-dealers were marketing, the Merrill Lynch Underwritten Securities as short-term investment-grade debt securities the liquidity of which was ensured by the periodic auctions.  Merrill Lynch marketed auction rate securities to its own retail customers in this fashion, and encouraged other broker-dealers to market the Merrill Lynch Underwritten Securities in the same manner.  Merrill Lynch knew that these deceptive marketing practices were standard throughout the industry.  In addition, Merrill Lynch entered into re-marketing agreements with other broker-dealers to create a distribution channel for the Merrill Lynch Underwritten Securities, and paid commissions to these broker-dealers for their success in placing the Merrill Lynch Underwritten Securities with their own customers.  Merrill Lynch also made extraordinary upfront payments in order to incentivize members of its distribution channel to encourage their clients to participate in the initial placement of the Merrill Lynch Underwritten Securities.  Merrill Lynch never disclosed these financial arrangements to the ultimate purchasers of the Merrill Lynch Underwritten Securities.

4.    Unbeknownst to Teva, however, at all relevant times, Merrill Lynch was engaged in an elaborate scheme to deceive investors about its involvement in the auction rate market.  As part of this scheme, Merrill Lynch was secretly manipulating the auction process for auction rate securities underwritten by Merrill Lynch by, among other things, submitting bids to control the interest rates that the securities would pay and to ensure that the auctions did not fail.  Merrill Lynch omitted material information about the nature and characteristics of the Merrill Lynch Underwritten Securities, the manner in which the auction process functioned, and Merrill Lynch's bidding and other activities in the auctions for the Merrill Lynch Underwritten Securities.  As a result of these and other related, undisclosed activities, Merrill Lynch frequently placed bids in the auctions for these CDO auction rate securities, and frequently purchased other CDO notes as well.  Indeed, over time, Merrill Lynch amassed a portfolio of CDO notes and auction rate CDO notes totaling more than $30 billion.

5.    Merrill Lynch took steps to conceal the overall size of its holdings of CDO notes, including auction rate notes.  Merrill Lynch deceived prospective investors, including Teva, about the extent to which Merrill Lynch was creating the appearance of legitimate market demand for the CDO products that Merrill Lynch underwrote.  Indeed, although Merrill Lynch & Co. would eventually be forced to write down the value of its CDO portfolio by nearly $20 billion – including writedowns of $6.9 billion announced in October 2007 and an additional $9.8 billion announced in January 2008 – Merrill Lynch & Co.'s SEC Form 10-K for the year ended December 29, 2006 (filed February 26, 2007) contains no disclosure of Merrill Lynch & Co.'s extensive portfolio of CDO notes.

6.    In late 2007, unbeknownst to Teva, capital constraints forced Merrill Lynch to discontinue its manipulative participation in the auction process.  As Merrill Lynch struggled to

manage its enormous exposure to CDO notes and CDO auction rate notes, Merrill Lynch did not

disclose that its past participation in the auctions for CDO auction rate securities had the effect of

setting interest rates and preventing auctions from failing.  Nor did Merrill Lynch disclose that it

was terminating these activities.  When Merrill Lynch discontinued its manipulative participation

in the market, auctions for CDO notes and other auction rate securities underwritten by Merrill

Lynch and Merrill Lynch International failed.  Over time, as it became increasingly apparent that

there was no longer any liquidity in the market for CDO auction rate notes, and that Merrill

Lynch had been responsible for the appearance of liquidity, demand for these securities at

auction evaporated.  As a result, there are virtually no buyers for the Merrill Lynch Underwritten

Securities, either at auction or in the secondary market.  Despite repeated efforts to sell its

portfolio of the Merrill Lynch Underwritten Securities at par, Teva has been unable to do so.  As

a result, Teva Ltd. and its wholly owned subsidiaries are currently holding approximately $273

million in par value of auction rate securities, which have a fair market value of less than $10

million.

## THE PARTIES

7.    Plaintiff Teva Pharmaceutical Industries Ltd. ("Teva Ltd.") is a multinational

pharmaceutical company incorporated and headquartered in Israel.  It specializes in the

development, production, and marketing of generic and proprietary branded pharmaceuticals as

well as active pharmaceutical ingredients.  All of the other plaintiffs are, directly or indirectly,

wholly owned subsidiaries of Teva Ltd.   In addition, Teva Ltd. is the successor-in-interest to its

former subsidiary Teva Pharmaceuticals Finance Iceland III SF Reykjavik ("Teva-Iceland").

Teva-Iceland was incorporated in Iceland and had a registered address of Tryggvagata 16 R.

Reykjavik, Iceland.

8.    Plaintiff Teva Pharmaceutical Works Private Limited Company ("Teva-Hungary") is a Hungarian company with its principal place of operations in Debrecen, Hungary.

9.    Plaintiff Teva Pharmaceuticals Curacao NV ("Teva-Curacao") is a company incorporated in the Netherlands Antilles, with its principal place of operations in Curacao, Netherlands Antilles.

10.    Defendant Merrill Lynch & Co., Inc. ("Merrill Lynch & Co.") is a global financial services and banking institution incorporated in Delaware and headquartered in New York, New York.  As of approximately January 1, 2009, Merrill Lynch & Co. became a wholly owned subsidiary of Bank of America Corporation.  At all relevant times, Merrill Lynch & Co. exercised control over and directed the policies and management of Defendants Merrill Lynch and Merrill Lynch International, including policies related to Merrill Lynch's and Merrill Lynch International's underwriting, marketing, sale, and purchase of CDO notes.  Merrill Lynch & Co. issued consolidated financial statements that included the results for Merrill Lynch and Merrill Lynch International, and that omitted material information about these Defendants' CDO holdings and related activities.  Merrill Lynch & Co. also shared principal officers and directors with Defendant Merrill Lynch.

11.    Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") is a Delaware corporation with its principal place of business in New York, New York.  Merrill Lynch is, and was at all relevant times, a securities broker-dealer licensed to do business in the State of New York and registered with the SEC, the State of New York, and the Financial Industry Regulatory Authority ("FINRA").  Merrill Lynch is a member of the New York Stock Exchange.  Merrill Lynch also conducts business under the name "Merrill Lynch & Co."  Merrill Lynch is a wholly owned principal operating subsidiary of Defendant Merrill Lynch & Co.

12.     Defendant Merrill Lynch International is a corporation organized under the laws of England and Wales with its principal place of business in London.  Merrill Lynch International was, at all relevant times, a global dealer in equity and fixed income securities. Merrill Lynch International served as the underwriter for Dekania CDO I, Ltd., using Merrill Lynch as its agent for sales to purchasers in the United States and Canada.  Merrill Lynch International designed and structured these securities to be sold, and they were marketed and distributed, to investors in the United States.  Merrill Lynch International was, at all relevant times, an indirect wholly owned subsidiary of Defendant Merrill Lynch & Co.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), as amended, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1367.  The claims asserted herein arise (in part) under Sections 10(b) and 20 of the Exchange Act, 15 U.S.C. §§ 78j(b), 78(t), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  This action additionally contains supplemental state-law claims.

14.     This Court has personal jurisdiction over the Defendants because each of the Defendants is present in the State of New York, has its principal place of business in the State of New York, and/or has transacted business and continues to transact business within this state.

15.     Venue is proper within this District under 28 U.S.C. § 1391 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because a substantial part of the events or omissions giving rise to the claims occurred within this District.  Venue is also proper within this District because Merrill Lynch & Co. and Merrill Lynch reside in this District and because Defendant Merrill Lynch International is an alien.

## TEVA'S WORKING AND INVESTMENT CAPITAL ACCOUNTS

16.    Teva is in the business of developing, manufacturing, and marketing generic and proprietary pharmaceutical products around the globe.  Teva operates through numerous subsidiaries around the world, including each of the subsidiaries that is a Plaintiff in this action. Teva and its subsidiaries maintained significant cash balances generated through their business activities to fund their operational requirements, with certain projected surplus funds invested in short-term instruments that could be liquidated on short notice.  Teva has adopted conservative investment guidelines for purposes of these investments, based upon two overriding principles – the preservation and maintenance of principal, and short-term liquidity.  As a result, Teva invested these surplus funds in highly liquid, short-term, highly rated instruments such as certificates of deposit, treasury bills, money market funds, short-term commercial paper, and other analogous products.

17.    Teva had a general policy prohibiting any investment of its working capital in long-term, illiquid, or speculative investments.  Because Teva's overarching goals were the preservation of principal and the maintenance of short-term liquidity, Teva was willing to forgo higher returns in order to ensure access to its funds.

18.    For purposes of investing its surplus capital, Teva developed relationships with several of the most prominent and, at the time, respected investment banks.  In reliance upon its reputation for honesty and integrity, as well as representations concerning its sophistication and expertise, Teva entered into a financial advisory relationship with the International Private Banking Group of Merrill Lynch.  Teva opened an account with Merrill Lynch in approximately 1999-2000, through which Teva invested tens of millions of dollars in instruments that were introduced and specifically recommended by Merrill Lynch.  Teva paid Merrill Lynch fees in the

amount of approximately 20 basis points per year on the funds that Merrill Lynch invested on Teva's behalf, and Teva expected that Merrill Lynch would discharge all of the fiduciary obligations that this advisory relationship created.

**MERRILL LYNCH'S STRUCTURING, UNDERWRITING,
AND MARKETING OF CDO AUCTION RATE NOTES**

**Merrill Lynch's Effort To Revitalize Its Fixed-Income Underwriting Business**

19.    Merrill Lynch is an investment bank that, among other things, underwrites fixed-income and debt securities. The revenue and net income that Merrill Lynch generates from its debt underwriting business is based on, among other things, the dollar value of the fixed-income securities that it brings to market and the dollar value of the securities that it sells to investors.

20.    Merrill Lynch was among the biggest underwriters of fixed-income securities on Wall Street for much of the 1990s. The firm often topped the Thomson Financial industry league tables for investment-grade debt and was in the top five for high-yield debt. In 1998, for instance, Merrill Lynch was the top-ranked investment bank in investment-grade debt, with a 19 percent market share.

21.    From 1998 through 2002, however, Merrill Lynch's fixed-income underwriting business declined precipitously. By 2001, according to Thomson Financial, Merrill Lynch had fallen to sixth place, with a market share of only 6.5 percent. Starting in approximately 2002, in an effort to enhance the firm's profitability and in response to directives from Merrill Lynch & Co., Merrill Lynch embarked upon a concerted effort to expand its fixed-income business by focusing on underwriting and servicing a category of securities known as collateralized debt obligations or CDOs.

22.    In early 2003, Merrill Lynch hired a team of senior investment bankers from Credit Suisse First Boston ("Credit Suisse") who specialized in structuring, underwriting, and

9

marketing CDOs.  At the time, Merrill Lynch announced publicly that it was "committed" to the CDO business.

        A.      <u>Collateralized Debt Obligations (CDOs)</u>

       23.      CDOs are a form of asset-backed securities, typically structured and controlled by underwriters such as Merrill Lynch.  The CDO issuer is typically an offshore special-purpose vehicle.  The issuer generates investment capital by selling notes of varying priorities.  Each class or "tranche" of notes typically has its own credit rating and interest rate.  The holder of each CDO note has the right to receive periodic payments based upon the face value of the note and the applicable interest rate, and, eventually, a return of principal.

       24.      The issuer typically uses the proceeds from the sale of CDO notes to acquire various types of debt obligations, such as residential or commercial mortgage-backed securities, consumer and retail debt, synthetic securities, and even notes issued by other CDOs.  Following payment of certain administrative costs, the cash flows generated from these underlying assets are used to pay interest to the holders of the CDO notes.  The holders of the most senior tranche (frequently called the A-1 tranche) typically receive interest payments when due before holders of the subordinate notes.  Holders of each subordinate note, in turn, are then paid in full before any payments are made to holders of subordinate tranches.  To compensate for the risk that the cash flows may prove insufficient to cover their interest or principal payments, each subordinate tranche typically is paid a higher interest rate than the more senior tranches.

       25.      Merrill Lynch and Merrill Lynch International, like other investment banking firms that underwrote CDOs, were involved in many aspects of structuring, managing, marketing, and selling CDO products.  With respect to the Merrill Lynch Underwritten Securities, Merrill Lynch and Merrill Lynch International were involved in creating the offshore

entity or entities that issued the CDO notes. Merrill Lynch and Merrill Lynch International selected and hired the "collateral manager" – the entity responsible for identifying and purchasing (in consultation with Merrill Lynch and often from Merrill Lynch) the underlying collateral. Merrill Lynch and Merrill Lynch International selected and hired the trustee – the entity responsible for holding the collateral, receiving income generated by the collateral, and making interest payments to the CDO noteholders. Merrill Lynch and Merrill Lynch International interacted with the rating agencies to secure favorable ratings for each tranche of notes. Merrill Lynch and Merrill Lynch International participated in drafting the offering statement, private placement memorandum, and the indenture. As sole or lead underwriter, Merrill Lynch and Merrill Lynch International would purchase all of the CDO notes from the issuer with the goal of immediately selling the notes to investors. When those efforts were unsuccessful, Merrill Lynch and Merrill Lynch International would retain ownership of any unsold CDO notes.

26.     For CDOs that contained an auction rate tranche of notes, as described in greater detail below, Merrill Lynch and Merrill Lynch International performed additional functions. Merrill Lynch and Merrill Lynch International would select and hire the auction agent – the entity that would receive all auction orders from Merrill Lynch and conduct the Dutch auction that determined the periodic interest payable on each auction rate note. Merrill Lynch and Merrill Lynch International additionally participated in drafting the auction rate supplements to the offering statements.

27.     In addition, Merrill Lynch typically served as the sole broker-dealer for the auctions, with responsibility for receiving and transmitting all buy, hold, or sell orders in every auction. Merrill Lynch received commissions in connection with each auction (typically 25 basis

points of the par value of the auction rate tranche) and entered into re-marketing agreements with

other broker-dealers who placed orders for the Merrill Lynch Underwritten Securities with

Merrill Lynch.  Pursuant to these agreements, Merrill Lynch would pay a portion of the

commissions to any downstream broker whose customer acquired any of the Merrill Lynch

Underwritten Securities.  Merrill Lynch paid additional placement fees to any downstream

broker whose customer acquired any of the Merrill Lynch Underwritten Securities in the initial

placement.

        B.      <u>Merrill Lynch's Recent CDO Underwriting Activities</u>

        28.      Merrill Lynch's efforts to expand its CDO underwriting appeared to be extremely

successful.  In 2003, Merrill Lynch underwrote $4.8 billion of CDOs, which represented 9.2

percent of the total CDO underwritings in the United States.  Merrill Lynch thereby moved from

tenth place (in 2002) to fourth place among underwriters in the Thomson Financial league tables

for United States CDOs, as measured by the value of the securities underwritten.  Merrill Lynch

was the largest underwriter of CDOs in the United States in 2004, underwriting more than $15

billion of CDO notes, which represented 17.2 percent of the CDO market.  Merrill Lynch

remained the leading underwriter of CDOs over the next several years.  Merrill Lynch

underwrote approximately $55 billion of CDOs in 2006.  In the first quarter of 2007, Merrill

Lynch underwrote approximately 22.9 percent of all CDOs in the United States.

        29.      The design, creation, structuring, packaging, underwriting, and marketing of

CDOs generated significant revenues for Merrill Lynch.  According to articles published in the

*Wall Street Journal*, Merrill Lynch typically earned underwriting fees ranging from 1 percent to

1.5 percent of its CDO underwritings, such that Merrill Lynch would earn $10 to $15 million in

revenue for underwriting $1 billion of CDO notes.  Other public reports indicate that Merrill

Lynch was paid approximately $700 million in CDO underwriting fees in 2006 and an additional $395 million in 2007.

30.     The amount of Merrill Lynch's CDO underwritings exceeded investor demand. When Merrill Lynch was unable to find buyers for the CDO notes it underwrote, Merrill Lynch retained ownership of those notes.  According to an April 16, 2008 article in the *Wall Street Journal*, Merrill Lynch took increasing volumes of CDO notes onto its balance sheet in order to ensure that the CDOs it underwrote could close, and that Merrill Lynch could earn and recognize the underwriting fees associated with each CDO.  According to that same article, Merrill Lynch fired several senior executives who objected to these practices.

31.     As the total dollar value of CDO notes that Merrill Lynch held in inventory increased, Merrill Lynch began to use these securities as collateral for newly created CDOs.  In other words, Merrill Lynch structured and underwrote new CDOs that purchased the CDO notes in Merrill Lynch's inventory.  These new CDOs, which held previously issued CDO notes as collateral, became known in the industry as "CDO-squared."  To the extent Merrill Lynch was unable to find buyers for the CDO-squared notes that it underwrote, Merrill Lynch again retained ownership of those securities.  Later on, as Merrill Lynch's inventory of CDO-squared notes increased, Merrill Lynch created new CDOs that purchased CDO-squared notes – known as "CDO-cubed."

32.     Merrill Lynch acknowledged, in part, the motivation for these activities in October 2007, stating that, "[a]s the market for these securities began to deteriorate in the first quarter, we began substantially reducing our warehouse risk by constructing CDOs and retaining the highest parts of the capital structure, which we expected then to be more resistant to market disruptions in terms of both liquidity and price. . . .  During the quarter and throughout the year,

we have substantially reduced our net exposures and continue to work to do more." In late 2007, Merrill Lynch & Co. reported that it owned approximately $32 billion of CDO notes.

      C.     Merrill Lynch's Underwriting of CDO Auction Rate Notes

      33.     Most CDO notes are unregistered, long-term debt securities that can be sold only to qualified institutional buyers or foreign investors. In light of the fact that the investment guidelines for many corporate treasury departments and other institutional customers are limited to short-term, liquid instruments with high credit quality, CDOs were not an attractive or available investment for this class of prospective purchasers. In order to market CDOs to this group of investors, Merrill Lynch and Merrill Lynch International designed and structured a form of CDO note that would appear to meet the liquidity and durational requirements that could not be satisfied by existing CDO notes. By no later than 2003, Merrill Lynch and Merrill Lynch International designed, structured, and underwrote CDOs that included a senior-level tranche of auction rate securities.

      1.    *Auction Rate Securities*

      34.     Auction rate securities are debt or equity instruments with long-term or perpetual maturities that pay interest or dividends at rates set through periodic Dutch auctions. Auction rate securities are purchased and sold only at par during these periodic auctions. They can also trade at discounts or premiums to par in the secondary market.

      35.     At each periodic auction, existing holders of auction rate securities must either place an order to sell their securities, hold their securities at whatever rate is established through the Dutch auction, or hold their securities provided that the clearing rate is greater than a specified rate. Interested buyers place bids for a specific quantity of securities at a specific rate of interest. All auction rate securities are purchased and sold at par at auction.

36.     In a Dutch auction, buy and sell orders are filled beginning by matching, in ascending order of interest rate, sell orders with buy orders, until all securities available for sale are matched with buy orders.  The rate at which the final sell order is filled is known as the "clearing rate," and that rate applies to the entire issue of the auction rate securities – including all lower buy orders, as well as to existing holders that chose to hold their securities at market.

37.     In the event there are more sell orders than buy orders, the auction "fails."  The offering statement for each auction rate security identifies the interest rate (either a fixed rate or a formula tied to a floating rate such as the London Inter-Bank Offer Rate ("LIBOR")) that will be paid in the event of a failed auction.  This is known as the "fail rate."  When an auction fails, all existing holders of auction rate securities continue to own the securities and receive interest at the fail rate until the next auction is held.  At the next scheduled auction, the interest paid on the auction rate securities will be determined as described above.

2.      *Merrill Lynch's Role in the Market for Its CDO Auction Rate Notes*

38.     Merrill Lynch added an auction rate tranche to certain of the CDOs it underwrote to enable Merrill Lynch to market these notes as short-term, highly liquid debt.  The Merrill Lynch Underwritten Securities (and other CDO auction rate notes) have defined "minimum" and "maximum applicable rates" – the former applies in the case of an "all hold" auction, where no holder seeks to sell, while the latter applies in the case of a failed auction.  Merrill Lynch typically set the minimum rates at 90 percent of one-month LIBOR and the maximum rates within 100 basis points of one-month LIBOR.  Accordingly, the rate of interest on the CDO auction rate notes was typically set within a narrow collar based around one-month LIBOR, offering rates of interest similar to that provided by other short-term, liquid securities.

39.     In addition to ensuring that its CDO auction rate notes offered rates of interest comparable to short-term, liquid debt securities, Merrill Lynch designed the Merrill Lynch Underwritten Securities to provide greater liquidity than long-term CDO notes.  For this purpose, the Merrill Lynch Underwritten Securities and other CDO auction rate notes were re-priced and re-issued at pre-established intervals (typically monthly or quarterly) through the Dutch auction process.  Holders of the Merrill Lynch Underwritten Securities therefore would participate in auctions at pre-determined periods at which they could:  (i) offer their securities for sale to potential buyers; (ii) hold their securities provided that the interest rate reset at not less than a specified level; or (iii) hold their securities and receive whatever rate was determined through the auction process.

40.     Merrill Lynch was the sole or exclusive broker-dealer for all orders submitted in the periodic auctions for its CDO auction rate notes.  Accordingly, all bids to purchase or orders to sell the CDO auction rate notes had to be submitted to Merrill Lynch, which in turn would enter bids with the designated auction agent.  As described in detail below, in order to prevent auction failures, Merrill Lynch placed orders for its own account in 100 percent of the auctions for the Merrill Lynch Underwritten Securities.  Because Merrill Lynch had access to all bids to purchase, and orders to sell, the Merrill Lynch Underwritten Securities in these auctions, it could place bids for its own account in a manner designed to influence the outcome of the auction. Because the auctions were conducted anonymously, and because Merrill Lynch, in its capacity as the sole broker-dealer, did not identify the entity (including itself) placing any particular buy, sell, or hold order, other market participants could not determine whether, and to what extent, Merrill Lynch submitted bids in the auction for its own account.

41.     Merrill Lynch had no legitimate investment reason to purchase the Merrill Lynch Underwritten Securities at auction.  Merrill Lynch did not want to own these securities in its proprietary accounts for investment purposes, and it was not necessary for Merrill Lynch to maintain an inventory of these securities to satisfy demand from its customers.  Indeed, Merrill Lynch routinely tried to reduce – not increase – its inventory of CDO auction rate notes.  Rather, Merrill Lynch placed bids for the sole purpose of preventing auction failures and controlling the interest rate at which the auction cleared.  According to the trial testimony of James Child, who served as head of the fixed-income trading desk at Credit Suisse in 2007 and who testified on August 13, 2009 in *United States v. Butler*, Merrill Lynch routinely offered its inventory of CDO auction rate notes to other broker-dealers like Credit Suisse in the hope that their customers might purchase those securities from Merrill Lynch's inventory.

42.     Through the undisclosed bidding activities described above, Merrill Lynch created and perpetuated the false perception that the Merrill Lynch Underwritten Securities were highly liquid, short-term securities that could be readily sold at par in Dutch auctions.  If Merrill Lynch had not placed bids in auctions for the Merrill Lynch Underwritten Securities and permitted the natural interplay of supply and demand to control the auction results, auctions would have routinely failed and holders of the Merrill Lynch Underwritten Securities would have received higher rates of interest on the securities they owned.  By routinely placing bids that prevented auctions for the Merrill Lynch Underwritten Securities from failing, Merrill Lynch deceptively and manipulatively led investors to believe that there was sufficient, legitimate market demand for the Merrill Lynch Underwritten Securities to provide liquidity, when no such demand or liquidity existed.  Merrill Lynch's undisclosed bidding activity deprived current holders and potential purchasers of the Merrill Lynch Underwritten Securities

of market information concerning the actual demand for and the liquidity risks involved with these securities, instead sending false signals of genuine market demand.

**MERRILL LYNCH'S DECEPTIVE AND MANIPULATIVE CONDUCT IN THE PURCHASE AND SALE OF THE MERRILL LYNCH UNDERWRITTEN SECURITIES**

43.    At all times relevant to this Amended Complaint, Merrill Lynch and Merrill Lynch International played a central role in drafting the offering statements, auction rate supplements, and private placement memoranda used in connection with underwriting the Merrill Lynch Underwritten Securities.  Those documents contained, among other things, disclosures about the role of Merrill Lynch and Merrill Lynch International in structuring, issuing, underwriting, and trading the Merrill Lynch Underwritten Securities.  As a result, Merrill Lynch and Merrill Lynch International had a duty to ensure that they made full and accurate disclosures about their roles and activities and that the offering documents did not omit information necessary to make those disclosures complete and accurate in all material respects.

44.    In addition, Merrill Lynch and Merrill Lynch International had a duty to make full and accurate disclosures of all material information concerning Merrill Lynch's participation as the sole broker-dealer in auctions for the Merrill Lynch Underwritten Securities.  Merrill Lynch was required to make robust disclosures about the nature, extent, and motivation for any trading for its own account in auctions for the Merrill Lynch Underwritten Securities, including but not limited to disclosures about the extent of its bidding to prevent auction failures, and every instance that Merrill Lynch placed a bid at a price that Merrill Lynch did not believe to be at the then-prevailing market rate at the time it entered the bid.  These disclosures included the number, interest rate(s), and amount of any bids made by Merrill Lynch in any previous auction for any Merrill Lynch Underwritten Securities, as well as the effect those bids had on the result of that previous auction.

45.     It was unlawful for Merrill Lynch to manipulate, or attempt to manipulate, the price, trading in, or the market for any of the Merrill Lynch Underwritten Securities.

46.     Under the terms of a May 31, 2006 SEC Cease-and-Desist Order[2], beginning no later than August 31, 2006, Merrill Lynch was required to make these disclosures readily available to investors and to post on its website a written description of its then-current material practices and procedures with respect to its placement of bids in auctions for the Merrill Lynch Underwritten Securities and other activities that had the possibility of affecting the results of any auction for the Merrill Lynch Underwritten Securities.

47.     In addition, as *de facto* market maker for the Merrill Lynch Underwritten Securities, a position that Merrill Lynch occupied by virtue of its bidding for 100 percent of the securities at auction and its subsequent attempts to sell any inventory it acquired, Merrill Lynch had an affirmative obligation to disclose all material information concerning its role as market maker.

I.    **Merrill Lynch's Manipulative Bidding in Auctions for the Merrill Lynch Underwritten Securities**

48.     Unbeknownst to Teva, at all times relevant to this Amended Complaint, Merrill Lynch engaged in manipulative and deceptive conduct in auctions for the Merrill Lynch Underwritten Securities, as well as in secondary market transactions involving those securities. Among other things, Merrill Lynch regularly placed orders for its proprietary account in 100 percent of the auctions for the Merrill Lynch Underwritten Securities for the express purpose of preventing auction failures, preventing auctions from clearing at the "all hold" rate, and manipulating the rate at which auctions cleared.

---

[2] Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Section 15(b) of the Securities Exchange Act of 1934, *In re Bear, Stearns & Co.*, Admin. No. 3-12310, Release Nos. 8684 *et al.* (SEC May 31, 2006) ("SEC Cease-and-Desist Order"), *at* http://www.sec.gov/litigation/admin/2006/33-8684.pdf.

49.    In determining whether, and at what level, to place bids in auctions for the Merrill Lynch Underwritten Securities, Merrill Lynch had access to non-public information that it received through its role as the sole broker-dealer for the auction of the Merrill Lynch Underwritten Securities.  As a result of its access to this non-public information, Merrill Lynch knew the amounts and rates of other bidders in the auction, and therefore had a significant unfair advantage over other bidders.  Merrill Lynch appears to have exploited this non-public information to its advantage and to the detriment of other bidders, as it submitted orders in auctions for the Merrill Lynch Underwritten Securities to prevent auction failures or all-hold rates and to control the price at which auctions cleared.

50.    Among other things, in every auction for the Merrill Lynch Underwritten Securities, Merrill Lynch placed bids for the entire amount outstanding for the particular Merrill Lynch Underwritten Security, regardless of the size or volume of buy, sell, or hold orders that Merrill Lynch had received.  The purpose of placing these bids was to make it falsely appear to the auction agent, current and potential holders of the Merrill Lynch Underwritten Securities, and regulatory authorities that there was sufficient legitimate demand, other than from bids placed on behalf of Merrill Lynch's proprietary trading accounts, to enable the rate for the Merrill Lynch Underwritten Securities to be determined through the natural interplay of supply and demand from customers.  By sending false signals of genuine demand to the marketplace, Merrill Lynch sought to induce others to purchase the Merrill Lynch Underwritten Securities.

51.    In addition, Merrill Lynch routinely placed buy orders for its proprietary trading account in auctions for the Merrill Lynch Underwritten Securities in amounts, and at prices, designed to control the rate at which an auction for the Merrill Lynch Underwritten Securities would clear.  Merrill Lynch also encouraged its customers, as well as other broker-dealers in its

distribution channel, to submit bids in auctions for the Merrill Lynch Underwritten Securities so as to prevent auction failures or all-hold rates and to control the price at which auctions cleared.

52.    But for these manipulative and deceptive practices, a significant percentage of the auctions for the Merrill Lynch Underwritten Securities either would have failed or would have cleared at a higher interest rate.

## II.    Merrill Lynch's Omission of Material Information Concerning Its Activities in the Market for the Merrill Lynch Underwritten Securities

53.    As described above, Merrill Lynch and Merrill Lynch International knew at all times relevant to this Amended Complaint that, in the absence of Merrill Lynch's involvement in the auctions for the Merrill Lynch Underwritten Securities, the auctions would routinely fail or would clear at a higher rate of interest.  Merrill Lynch and Merrill Lynch International also knew that the failure of auctions for any of the Merrill Lynch Underwritten Securities would severely impair their CDO structuring and underwriting business, and cause significant collateral consequences to Merrill Lynch and Merrill Lynch International.

54.    Merrill Lynch and Merrill Lynch International failed to make full and complete disclosures of all material information regarding the nature and extent of their involvement in structuring, underwriting, and participating in auctions for the Merrill Lynch Underwritten Securities.  In connection with the purchase and sale of the Merrill Lynch Underwritten Securities, Merrill Lynch and Merrill Lynch International failed to disclose, among other things, that:

    i.    there was insufficient legitimate third-party demand in a significant number of auctions for the Merrill Lynch Underwritten Securities to avoid auction failures;

    ii.    Merrill Lynch placed bids in all auctions for the Merrill Lynch Underwritten Securities;

iii.      Merrill Lynch always had access to non-public information about the bids submitted on behalf of other buyers and sellers prior to the auction for every Merrill Lynch Underwritten Security;

iv.      in determining the amounts and rates at which to bid for its own account in auctions for the Merrill Lynch Underwritten Securities, Merrill Lynch had access to orders submitted by all other buyers and sellers, and had the opportunity to use this information to the detriment of other bidders;

v.      Merrill Lynch submitted bids in auctions for the Merrill Lynch Underwritten Securities for the full amount of the securities at auction for the purpose of preventing a failed auction;

vi.      Merrill Lynch selected the amounts and rates of the bids submitted for its own account in auctions for the Merrill Lynch Underwritten Securities in order to control the rate at which the auctions would clear;

vii.      without Merrill Lynch's bids in auctions for the Merrill Lynch Underwritten Securities, there were more sell orders than buy orders in a significant number of auctions and, as a result, those auctions would have failed;

viii.      without Merrill Lynch's bids in auctions for the Merrill Lynch Underwritten Securities, the interest rate paid to holders of the Merrill Lynch Underwritten Securities would have been the fail rate;

ix.      the bids entered on behalf of Merrill Lynch in auctions for the Merrill Lynch Underwritten Securities reduced the interest rate that would have otherwise resulted from the auction;

x.      Merrill Lynch placed bids for its own account in auctions for the Merrill Lynch Underwritten Securities in order to create an appearance of liquidity for the Merrill Lynch Underwritten Securities that did not exist;

xi.      Merrill Lynch had no legitimate investment interest in acquiring the Merrill Lynch Underwritten Securities, and was actively seeking to sell the securities that it acquired at auction and/or held in inventory;

xii.      without the bids placed by Merrill Lynch in auctions for the Merrill Lynch Underwritten Securities, those securities would not perform in a manner similar to investment-grade, short-term variable rate securities;

xiii.      without the bids placed by Merrill Lynch for its own account in auctions for the Merrill Lynch Underwritten Securities, there was no efficient liquid market for the Merrill Lynch Underwritten Securities;

xiv.     as a result of the involvement of Merrill Lynch in auctions for the Merrill Lynch Underwritten Securities, Merrill Lynch maintained a substantial inventory of Merrill Lynch Underwritten Securities;

xv.     in the absence of bids placed by Merrill Lynch for its own account, there would be little or no demand for the Merrill Lynch Underwritten Securities, and therefore it would be extremely unlikely that holders of the Merrill Lynch Underwritten Securities could sell their securities at par, if at all;

xvi.     Merrill Lynch made extraordinary upfront payments to downstream broker-dealers that purchased the Merrill Underwritten Securities for their customers in connection with Merrill Lynch's initial placement of these securities; and

xvii.     as a result of Merrill Lynch's past involvement in auctions for CDO auction rate notes and related activities in the market for CDO notes, Merrill Lynch was holding tens of billions of dollars worth of CDO notes and, due to capital constraints, could not continue to place orders in auctions for the Merrill Lynch Underwritten Securities to prevent auction failures.

55.     Various documents prepared by Merrill Lynch and Merrill Lynch International, including but not limited to the offering memoranda, auction rate supplements, and private placement memoranda for the Merrill Lynch Underwritten Securities, omitted these material disclosures. Although these and other documents contained some generalized disclosures about the involvement of Merrill Lynch in auctions for the Merrill Lynch Underwritten Securities, those disclosures contained some or all of the material omissions set forth above.

## III.    The Market Impact of Merrill Lynch's Manipulative and Deceptive Conduct

56.     Merrill Lynch had no legitimate investment motive for bidding for its own account in auctions for the Merrill Lynch Underwritten Securities. Moreover, there was insufficient demand for CDO notes in the secondary market to justify Merrill Lynch maintaining a multi-billion dollar portfolio of these securities. By placing bids for its own account in auctions for the Merrill Lynch Underwritten Securities, Merrill Lynch caused the rates set in

these auctions to be lower than they otherwise would have been and reduced the rate and the amount of interest that holders of the Merrill Lynch Underwritten Securities earned.

57.     This conduct perpetuated the false impression among holders and potential buyers of the Merrill Lynch Underwritten Securities that there was significant demand for the Merrill Lynch Underwritten Securities from market participants other than Merrill Lynch, and therefore sufficient liquidity provided by the auction process to enable holders of the Merrill Lynch Underwritten Securities to sell these securities at par through the auction process.  This conduct additionally provided false and misleading information to holders and potential buyers of the Merrill Lynch Underwritten Securities as to how other investors valued the Merrill Lynch Underwritten Securities.  Merrill Lynch's conduct transmitted false information to the investing public, suggesting that there was ample demand for the Merrill Lynch Underwritten Securities and that all investors then seeking liquidity would be able to sell their securities at par.  It also falsely created the impression that the Merrill Lynch Underwritten Securities would perform like short-term, liquid, cash equivalents, and not illiquid long-term debt securities.

58.     According to the Massachusetts Office of the Secretary of the Commonwealth's Securities Division, which took extensive testimony from Merrill Lynch employees prior to filing an administrative complaint against the company, Merrill Lynch marketed auction rate securities to its own brokerage customers as "safe, cash like, and liquid investments," and its financial advisors "routinely represented [auction rate securities] to clients as fully-liquid, principal protected and cash-like."  Numerous other investment banks, including those banks that Merrill Lynch utilized as a chain of distribution for the Merrill Lynch Underwritten Securities, marketed auction rate securities in nearly identical terms.  On the basis of these misrepresentations concerning the safety and liquidity of auction rate securities, which were the

norm throughout the industry, the SEC and various state securities regulators have entered into

settlements with all of the largest investment banks, including but not limited to Bank of

America, Citigroup, Deutsche Bank, Merrill Lynch, the Royal Bank of Canada, UBS, and

Wachovia.  As former SEC Director of Enforcement Linda Chatman Thomsen explained in

September 18, 2008 testimony before the House Committee on Financial Services:

> Our actions were necessary because broker-dealer firms that underwrote, marketed and
> sold auction rate securities (ARS) misled their customers.  Through their sales forces,
> marketing materials, and account statements, firms misrepresented to their customers that
> ARS were safe, highly liquid investments that were equivalent to cash or money market
> funds.  As a result, numerous customers invested in ARS their savings and other funds
> they needed to have available on a short-term basis.  These firms failed to disclose the
> increasing risks associated with ARS, including their reduced ability to support the
> auctions.  By engaging in this conduct, those firms violated the Federal securities laws,
> including the broker-dealer antifraud provisions.

59.    Among the purposes and effects of Merrill Lynch's activities in auctions for the

Merrill Lynch Underwritten Securities was to enable Merrill Lynch and Merrill Lynch

International to continue to receive lucrative fees from structuring and underwriting new CDO

transactions, and to expand the pool of buyers for new and existing CDOs, including the Merrill

Lynch Underwritten Securities.  The activities of Merrill Lynch in auctions for the Merrill Lynch

Underwritten Securities also enabled Merrill Lynch, Merrill Lynch International, and their

distribution partners to continue falsely to claim to potential and existing buyers that CDO

auction rate notes, including the Merrill Lynch Underwritten Securities, would perform similarly

to other AAA-rated or equivalent short-term securities and money market alternatives, rather

than as illiquid long-term notes.

60.    In addition, the activities of Merrill Lynch in auctions for CDO auction rate notes,

including the Merrill Lynch Underwritten Securities, prevented or postponed the need for Merrill

Lynch and Merrill Lynch International to take substantial write-downs on the mark-to-market

value of their multi-billion dollar portfolio of CDO notes, and thereby enabled Merrill Lynch & Co. to avoid reporting catastrophic losses from write-downs on the portfolio of CDO notes on its current period income statement, thereby avoiding a significant drop in the market price of its common stock.

**IV.     Merrill Lynch Has Been Investigated and Sanctioned by Numerous Securities Regulators for Its Auction Rate Practices**

61.     As a result of its activities in the auction rate securities market, Merrill Lynch has been the target of numerous investigations and enforcement actions by securities regulators and law enforcement officials.

62.     In May 2006, the SEC initiated cease and desist proceedings against Merrill Lynch for certain of its practices as a broker-dealer in the auction rate securities market.  As found by the SEC, beginning as early as January 1, 2003, Merrill Lynch violated Section 17(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77q(a)(2), by "interven[ing] in auctions by bidding for [its] proprietary accounts or asking customers to make or change orders without adequate disclosures."[3]  The SEC concluded that Merrill Lynch's intervention in auctions for the purpose of preventing auction failures, *particularly in the absence of robust disclosures concerning the extent of this practice*, violated the prohibition on material misstatements and omissions in the offer and sale of securities.  In settling these charges, Merrill Lynch entered into an agreement with the SEC pursuant to which it agreed that, "commencing not later than 6 months after the entry of this Order, [Merrill Lynch] shall, at or before the completion of the applicable transaction, provide all customers who are first-time purchasers, and all broker-dealers who are purchasers, of auction rate securities from the Respondent . . . with a written

---

[3] SEC Cease-and-Desist Order at 6.

description of the Respondent's material auction practices and procedures."[4]  The SEC

additionally directed Merrill Lynch to post its "then-current material auction practices and

procedures" on its website by no later than August 31, 2006.[5]

63.    After an investigation conducted pursuant to Article 23-A of the New York

General Business Law (the "Martin Act"), the Office of the Attorney General of the State of

New York entered into an Assurance of Discontinuance with Merrill Lynch that was announced

on July 7, 2009.  The Attorney General issued written findings in which it concluded that Merrill

Lynch had materially misrepresented the nature, risk, and liquidity of auction rate securities,

falsely portraying them as "highly liquid, safe, cash management alternative investments."[6]  The

Attorney General further found that, "[s]ince the inception of the auction rate securities market,

Merrill Lynch and other broker-dealers submitted support bids, purchase orders for the entirety

of an auction rate security issue for which it acted as the sole or lead broker."[7]  Investors, the

Attorney General concluded, generally were "not aware that the auction rate securities market

was dependent upon Merrill Lynch's (and other broker-dealers') use of support bids for its

successful operation."[8]  Merrill Lynch paid the State of New York a civil penalty in the amount

of $23,245,213.97.

64.    Overall, Merrill Lynch has agreed to pay state securities regulators penalties in

the amount of $125 million (including New York) and to buy back billions of dollars in auction

---

[4] *Id.* at 10.

[5] *Id*. at 11.

[6] *See* Assurance of Discontinuance Pursuant to Executive Law § 63(15), ¶¶ 6-7, *In re Merrill Lynch, Pierce, Fenner & Smith Inc.*, AOD No. 08-174 (N.Y. Att'y Gen. Inv. Prot. Bur. July 2, 2009), *at* http://www.ml.com/media/113844.pdf.

[7] *Id.* ¶ 8.

[8] *Id.* ¶ 9.

rate securities from Merrill Lynch's retail customers.  As part of this multi-state agreement, on June 2, 2009, Merrill Lynch entered into a settlement with the Montana Securities Department whereby Merrill Lynch agreed to pay $372,000 in fines and to buy back $38 million in auction rate securities.  On June 11, 2009, Merrill Lynch entered into a settlement with the Arizona Corporation Commission whereby Merrill Lynch agreed to pay a $1,751,003 fine and to buy back $168.6 million in auction rate securities from retail customers in Arizona.  On June 18, 2009, Merrill Lynch entered into a settlement with the Colorado Division of Securities whereby Merrill Lynch agreed to buy back $256 million worth of auction rate securities from retail customers in Colorado.  Merrill Lynch has additionally entered into a settlement with the Commonwealth of Massachusetts Office of the Secretary of the Commonwealth, Securities Division, to resolve charges that Merrill Lynch had engaged in unethical or dishonest conduct or practices in connection with the auction rate securities market.

65.    On August 22, 2008, the SEC's Division of Enforcement announced that it had entered into a preliminary settlement in principle with Merrill Lynch arising out of Merrill Lynch's misrepresentations concerning the safety and liquidity of the auction rate securities market and Merrill Lynch's failure to disclose "that the liquidity of these securities was based on Merrill Lynch supporting the auctions it managed when there was not enough demand."  The SEC further indicated that Merrill Lynch faced "the prospect of a financial penalty to the SEC after it has completed its obligations under the settlement agreement."

66.    Like Merrill Lynch, nearly all of the most prominent investment banks have been the target of investigations and enforcement actions by securities regulators and law enforcement officials for their actions in marketing and manipulating the auctions for auction rate securities. To settle the actual and threatened enforcement actions, investment banks, including Merrill

Lynch, have collectively agreed to pay hundreds of millions of dollars in fines and to buy back tens of billions of dollars worth of auction rate securities from certain retail customers.

### MERRILL LYNCH'S AND MERRILL LYNCH INTERNATIONAL'S USE OF THE INSTRUMENTALITIES OF INTERSTATE COMMERCE

67.     In connection with Teva's purchases of the Merrill Lynch Underwritten Securities, Merrill Lynch and Merrill Lynch International used the mails and the instrumentalities of interstate commerce.  Among other things, Merrill Lynch and Merrill Lynch International distributed copies of offering statements, auction rate supplements, and private placement memoranda via mail and electronic-mail.  Merrill Lynch additionally received and transmitted bid information, and purchase and sale confirmations, to and from Teva's agent, via telephone, facsimile, e-mail, instant messaging, and/or the mails.

### MERRILL LYNCH'S MARKETING OF CDOs TO TEVA

68.     In approximately 1999-2000, Teva entered into a financial advisory relationship with Merrill Lynch, pursuant to which Merrill Lynch would recommend investments for a portion of Teva's surplus capital.  Teva worked with senior executives in Merrill Lynch's London office, who travelled to Israel on numerous occasions both to convince Teva to make investments through Merrill Lynch and to recommend particular investments.  During these meetings, and in regular telephone calls, representatives of Merrill Lynch stressed the services that they could provide to Teva, including but not limited to Merrill Lynch's sophistication and expertise with respect to investments in complex securities, including CDO securities, the breadth of securities to which Merrill Lynch had access, as well as Merrill Lynch's honesty, integrity, and experience.  Teva ultimately agreed to invest tens of millions of dollars through Merrill Lynch, and to permit Merrill Lynch to introduce Teva to other money managers.  Teva

provided Merrill Lynch with a copy of its investment guidelines, and placed its trust in Merrill Lynch to act in Teva's best interests.

69.     Beginning in 2003 and 2004, senior executives in Merrill Lynch's London office made repeated efforts to convince Teva to invest in CDO notes that had been underwritten by Merrill Lynch. These Merrill Lynch representatives recommended that Teva invest in notes issued by Merrill Lynch-underwritten CDOs. Merrill Lynch represented that the CDO structures had been developed and created by Merrill Lynch, that they were a sound investment that offered a significant potential return, and that Merrill Lynch fully endorsed the issuers.

70.     In or about early 2004, Merrill Lynch recommended that Teva invest in a tranche of the Merrill Lynch-underwritten Dekania CDO. In or about the Spring of 2004, Merrill Lynch recommended that Teva invest in a tranche of the Merrill Lynch-underwritten South Coast Funding CDO. In or about the Spring of 2005, Merrill Lynch recommended that Teva invest in a tranche of the Merrill Lynch-underwritten Class V Funding CDO. In each instance, Merrill Lynch provided Teva with a copy of the relevant offering statement, made representations about the safety and soundness of the underlying CDO, and recommended that Teva invest in securities issued by the Merrill Lynch-underwritten CDO.

71.     During their meetings and in their conversations with Teva, the Merrill Lynch representatives did not disclose that there was insufficient market demand for Merrill Lynch-underwritten CDO notes. Merrill Lynch did not disclose that it could not find buyers for various tranches of the Dekania, South Coast Funding, or Class V Funding CDOs, or for numerous other CDOs that Merrill Lynch had underwritten. Merrill Lynch did not disclose that it created a class of auction rate CDO notes in order to increase the pool of potential purchasers of the CDO notes. Merrill Lynch did not disclose that there was insufficient market demand for its auction rate

CDO notes in general, and that Merrill Lynch had a practice of placing support bids in 100 percent of the auctions for its auction rate CDO notes in order to ensure that the auctions would not fail.

72.    In reliance on Merrill Lynch's recommendations and assurances, Teva invested in securities issued by the Merrill Lynch-underwritten Dekania CDO in March 2004, South Coast Funding CDO in May 2004, and Class V Funding CDO in April 2005.

## TEVA'S PURCHASES OF THE MERRILL LYNCH UNDERWRITTEN SECURITIES

73.    At all times relevant to this Amended Complaint, Teva maintained cash balances in bank accounts throughout the world.  Teva sought to manage these funds so as to ensure they were safeguarded, earned a competitive rate of return, and were capable of being sold on short notice to fund Teva's operations.  As described below, Teva would invest a portion of these funds in conservative, short-term, investment-grade securities, such as commercial paper and United States treasury securities and other United States government-backed instruments.  Teva also purchased auction rate securities, including the Merrill Lynch Underwritten Securities, based on its understanding that these securities would perform like highly liquid, safe, short-term debt securities.  Teva believed that investments in securities of this nature would enable Teva to maximize the return on its cash, while ensuring Teva that the funds could be converted to cash on short notice.  Teva had a range of conservative, short-term investments available to it that were consistent with Teva's goals of safety and liquidity.

74.    The "auction" feature of the Merrill Lynch Underwritten Securities was attractive to Teva for a number of reasons.  Among other things, Teva believed that the "auction" feature would allow Teva to sell the Merrill Lynch Underwritten Securities on short notice, at par, through the auction process.  It also afforded Teva the opportunity to decide whether to hold or sell the securities, depending on the rate of interest established by the auction process and rates

for other short-term, liquid, highly rated securities.  Over time, as Teva had more and more favorable experiences with these features of the Merrill Lynch Underwritten Securities and the flexibility they provided for its cash-managements strategies, it held larger and larger amounts of the Merrill Lynch Underwritten Securities.

75.    Between January 2005 and August 2007, Teva purchased and sold hundreds of million of dollars of Merrill Lynch Underwritten Securities.  With respect to each such investment, Teva was able to purchase these securities at rates of interest that it found attractive, hold the securities for the time that it wanted its funds to be invested at rates it found acceptable, and then sell those securities at par, according to its cash-management needs.  Throughout this time period, as Teva repeatedly purchased and sold Merrill Lynch Underwritten Securities, the auction process for these securities functioned as Teva had come to expect.

76.    In approximately mid-August 2007, however, Teva placed an order to sell a Merrill Lynch Underwritten Security but was unable to do so because the auction failed. Thereafter, Teva placed sell orders in the auctions for all of its Merrill Lynch Underwritten Securities, but was unable to sell the securities because of auction failures.  Over time, Teva came to realize that these failures were not isolated events, but reflected a serious lack of demand for the Merrill Lynch Underwritten Securities that had been concealed from Teva as a result of the activities of Merrill Lynch in auctions for the Merrill Lynch Underwritten Securities and its broader actions in the CDO market.  Despite standing orders to sell all of its holdings in the Merrill Lynch Underwritten Securities, Teva and its subsidiaries still hold approximately $273 million par value of these securities.  As a result, Teva has been deprived of funds equivalent to the par value of these securities.

77.     Had Merrill Lynch and Merrill Lynch International not engaged in the deceptive, manipulative, and unlawful activities described above in auctions for the Merrill Lynch Underwritten Securities, and not made material omissions about the Merrill Lynch Underwritten Securities, Teva would never have purchased any of these securities.  Moreover, had Merrill Lynch and Merrill Lynch International not engaged in this deceptive, manipulative, and unlawful conduct, no rational investor would have purchased Merrill Lynch Underwritten Securities. Instead, Teva and other market participants would have promptly concluded that there were other, far more attractive opportunities for investments in safe, highly liquid, short-term debt securities than the Merrill Lynch Underwritten Securities.  Teva and other market participants also would have promptly concluded that the Merrill Lynch Underwritten Securities were, in fact, the equivalent of illiquid, long-term debt securities that could be sold, if at all, only at a substantial discount to par.  As the nature and extent of Merrill Lynch's deceptive and manipulative activities slowly began to be publicly revealed, and as the auctions for the Merrill Lynch Underwritten Securities continued to fail, Merrill Lynch does not appear to have underwritten another CDO with an auction rate tranche.  Without the deceptive, manipulative, and unlawful activities of Merrill Lynch and Merrill Lynch International, there would have been (and is) no market for CDO auction rate securities.

A.     Alesco II

78.     Merrill Lynch served as the underwriter, initial purchaser, and placement agent for Alesco Preferred Funding II, Ltd. ("Alesco II").  Alesco II issued securities in the following tranches:

| | |
|---|---|
| Class A-1 | $150,000,000.00 |
| Class A-2 | $66,000,000.00 |
| Class B-1 | $64,300,000.00 |
| Class B-2 | $40,000,000.00 |
| Preferred Shares | $28,300,000.00 |
| **Total** | **$348,600,000.00** |

The Class A-2 tranche of Alesco II, CUSIP #01448AAB1, was an auction rate security, with the interest rate determined through quarterly auctions that occurred on or about January 29, April 29, July 29, and October 29 of each year.  Merrill Lynch served as the sole broker-dealer for the Alesco II Class A-2 securities, which Merrill Lynch began selling into the marketplace on or about December 16, 2003.

79.     As the sole broker-dealer for the Alesco II auction rate notes, Merrill Lynch deceptively and manipulatively placed bids for its own account in auctions for the Alesco II Class A-2 notes, including bids in amounts that would prevent an auction from failing, bids at rates that were intended to alter the interest rate at which an auction otherwise would have cleared, and bids in amounts that ensured that an auction would clear in circumstances where, Merrill Lynch knew, there was a lack of bona fide purchasers of the Alesco II Class A-2 notes. Had Teva been aware of these deceptive and manipulative activities of Merrill Lynch, it would not have purchased the Alesco II Class A-2 notes at any price.

80.     Teva Ltd. and its subsidiaries previously purchased and sold Alesco II Class A-2 notes on or about the dates and in the amounts set forth below, in each instance making investment decisions in reliance upon the false appearance of legitimate market demand for those

notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about the Alesco II Class A-2 notes.

| Purchaser | Amount Purchased | Date Purchased | Date Sold |
|-----------|------------------|----------------|-----------|
| Teva Ltd. | $5,100,000 | 6/23/2005 | 10/31/2005 |
| Teva Ltd. | $4,200,000 | 8/1/2005 | 10/31/2005 |
| Teva-Curacao | $3,100,000 | 5/2/2006 | 12/21/2006 |
| Teva-Iceland | $3,000,000 | 10/30/2006 | 11/16/2006 |
| Teva-Iceland | $2,000,000 | 10/30/2006 | 12/20/2006 |
| Teva-Curacao | $2,300,000 | 1/30/2007 | 2/13/2007 |
| Teva-Hungary | $1,400,000 | 2/1/2007 | 2/15/2007 |
| Teva-Hungary | $2,000,000 | 1/30/2007 | 7/30/2007 |
| Teva Ltd. | $1,400,000 | 2/15/2007 | 3/27/2007 |

81.    Today, Teva currently holds $17.875 million par value of Alesco II Class A-2 notes, which were purchased at par by Teva subsidiaries through an agent in the amounts and on the dates set forth below, in each instance in reliance upon the false appearance of legitimate market demand for those securities created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about the Alesco II Class A-2 notes:

| Purchaser | Amount Purchased | Date Purchased |
|-----------|------------------|----------------|
| Teva-Hungary | $8,000,000 | 1/30/2007 |
| Teva-Curacao | $1,400,000 | 3/27/2007 |
| Teva-Iceland | $6,175,000 | 4/30/2007 |
| Teva-Curacao | $2,300,000 | 5/15/2007 |

At the time of those purchases, the actual value of these Alesco II Class A-2 notes was substantially less than the price Teva paid.  Teva has placed orders to sell these securities at each

auction held since late 2007, but those efforts have been unsuccessful. The current fair market value of these securities is approximately $2,077,000.

      B.    <u>Athilon</u>

     82.    Merrill Lynch served as the underwriter, initial purchaser, and placement agent for $150 million of auction rate securities issued by Athilon Capital Corp. ("Athilon"). The Athilon auction rate securities were issued in two series: (i) the $100 million Series E Senior Subordinated Notes; and (ii) the $50 million Series C Subordinated Notes, CUSIP #047468AH6, with the interest rate determined through auctions held every 28 days. Merrill Lynch served as the sole broker-dealer for the Class E and Class C Athilon auction rate securities, which Merrill Lynch began selling into the marketplace on or about June 18, 2007.

     83.    As the sole broker-dealer for the Athilon Series C auction rate securities, Merrill Lynch deceptively and manipulatively placed bids for its own account in auctions for the Athilon Series C Subordinated Notes, including bids in amounts that would prevent an auction from failing, bids at rates that were intended to alter the interest rate at which an auction otherwise would have cleared, and bids in amounts that ensured an auction would clear in circumstances where, Merrill Lynch knew, there was a lack of bona fide purchasers of the Athilon Series C Subordinated Notes. Had Teva been aware of these deceptive and manipulative activities of Merrill Lynch, it would not have purchased the Athilon Series C Subordinated Notes at any price.

     84.    Teva-Iceland purchased $10 million of the Athilon Series C Subordinated Notes at par on or about June 20, 2007, and Teva-Hungary purchased $5.1 million of the Athilon Series C Subordinated Notes at par on or about July 10, 2007. At the time of these purchases, the actual value of the Athilon Class C Subordinated Notes was substantially less than the price paid by

these Teva subsidiaries.  Teva purchased these securities in reliance upon the false appearance of

legitimate market demand for the Athilon Series C Subordinated Notes created by the results of

prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and

Merrill Lynch's material omissions about the Athilon Series C Subordinated Notes.  Teva has

placed orders to sell these securities at each auction held since late 2007, but those efforts have

been unsuccessful.  The current fair market value of these securities is approximately $923,000.

C.    Broderick

85.    Merrill Lynch served as the underwriter, initial purchaser, and placement agent

for Broderick CDO 1 Ltd. ("Broderick").  Broderick issued securities in the following tranches:

| | |
|---|---:|
| Class A-1V | $250,000.00 |
| Class A-1NVA | $354,750,000.00 |
| Class A-1NVB | $485,000,000.00 |
| Class A-2 | $85,000,000.00 |
| Class B | $43,000,000.00 |
| Class C | $23,000,000.00 |
| Preferred Shares | $8,500,000.00 |
| **Total** | **$999,500,000.00** |

The Class A-2 tranche of Broderick, CUSIP #112021AE0, was an auction rate security, with the

interest rate determined through monthly auctions that occurred on or about the second day of

each month.  Merrill Lynch served as the sole broker-dealer for the Broderick Class A-2 notes,

which Merrill Lynch began selling into the marketplace on or about December 13, 2005.

86.    As the sole broker-dealer for the Broderick Class A-2 notes, Merrill Lynch

deceptively and manipulatively placed bids for its own account in auctions for the Class A-2

notes, including bids in amounts that would prevent an auction from failing, bids at rates that

were intended to alter the interest rate at which an auction otherwise would have cleared, and

bids in amounts that ensured that an auction would clear in circumstances where, Merrill Lynch

knew, there was a lack of bona fide purchasers of the Broderick Class A-2 notes.  Had Teva been

aware of these deceptive and manipulative activities of Merrill Lynch, it would not have purchased the Broderick Class A-2 notes at any price.

87.    Teva subsidiaries purchased and sold these Broderick auction rate securities on or about the dates and in the amounts set forth below, in each instance making investment decisions in reliance upon the false appearance of legitimate market demand for those notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about the Broderick Class A-2 notes.

| Purchaser | Amount Purchased | Date Purchased | Date Sold |
|---|---|---|---|
| Teva-Curacao | $1,975,000 | 3/3/2006 | 8/3/2006 |
| Teva-Hungary | $10,000,000 | 4/3/2006 | 4/27/2006 |
| Teva-Iceland | $5,000,000 | 8/3/2006 | 9/5/2006 |
| Teva-Hungary | $3,250,000 | 3/27/2007 | 4/3/2007 |
| Teva-Hungary | $10,000,000 | 5/3/2007 | 5/10/2007 |
| Teva-Curacao | $10,000,000 | 5/10/2007 | 5/21/2007 |
| Teva-Hungary | $10,000,000 | 5/21/2007 | 6/12/2007 |
| Teva-Hungary | $6,525,000 | 6/4/2007 | 6/12/2007 |

88.    Teva currently holds $10 million par value of Broderick Class A-2 notes, which were purchased at par by Teva subsidiaries in the amounts and on or about the dates set forth below, in each instance in reliance upon the false appearance of legitimate market demand for those securities created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about the Broderick Class A-2 notes:

| Purchaser | Amount Purchased | Date Purchased |
|---|---|---|
| Teva-Hungary | $1,875,000 | 6/4/2007 |
| Teva-Hungary | $3,475,000 | 6/4/2007 |
| Teva-Hungary | $4,650,000 | 7/2/2007 |

At the time of these purchases, the actual value of these Broderick Class A-2 notes was substantially less than the price Teva paid. Teva has placed orders to sell these securities at each auction held since late August 2007, but those efforts have been unsuccessful. The current fair market value of these securities is approximately $105,000.

      D.    <u>Cascade</u>

      89.    Merrill Lynch served as the underwriter, initial purchaser, and placement agent for Cascade Funding CDO I, Ltd. ("Cascade"). Cascade issued securities in the following tranches:

| | |
|---|---|
| Class A-1 | $328,000,000.00 |
| Class A-2 | $46,000,000.00 |
| Class B | $14,000,000.00 |
| Class C | $7,000,000.00 |
| Preference Shares | $7,700,000.00 |
| **Total** | **$402,700,000.00** |

The Class A-2 tranche of Cascade, CUSIP #147276AE9, was an auction rate security, with the interest rate determined through monthly auctions that occurred on or about the second day of each month. Merrill Lynch served as the sole broker-dealer for the Cascade Class A-2 notes, which Merrill Lynch began selling into the marketplace on or about July 23, 2004.

      90.    As the sole broker-dealer for the Cascade Class A-2 notes, Merrill Lynch deceptively and manipulatively placed bids for its own account in auctions for the Class A-2 notes, including bids in amounts that would prevent an auction from failing, bids at rates that were intended to alter the interest rate at which an auction otherwise would have cleared, and bids in amounts that ensured that an auction would clear in circumstances where, Merrill Lynch knew, there was a lack of bona fide purchasers of the Cascade Class A-2 notes. Had Teva been aware of these deceptive and manipulative activities of Merrill Lynch, it would not have purchased the Cascade Class A-2 notes at any price.

91.     Teva Ltd. and its subsidiaries purchased and sold these Cascade Class A-2 notes on or about the dates and in the amounts set forth below, in each instance making investment decisions in reliance upon the false appearance of legitimate market demand for those notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about the Cascade Class A-2 notes:

| Purchaser | Amount Purchased | Date Purchased | Date Sold |
|---|---|---|---|
| Teva Ltd. | $3,300,000 | 1/4/2007 | 3/15/2007 |
| Teva Ltd. | $3,000,000 | 1/30/2007 | 3/15/2007 |
| Teva-Hungary | $10,000,000 | 1/30/2007 | 4/3/2007 |
| Teva Ltd. | $3,000,000 | 2/5/2007 | 3/15/2007 |
| Teva-Hungary | $10,000,000 | 4/3/2007 | 5/10/2007 |
| Teva-Curacao | $10,000,000 | 5/10/2007 | 5/21/2007 |

92.     Teva currently holds $27 million par value of Cascade Class A-2 notes, which were purchased at par by Teva subsidiaries through an agent in the amounts and on or about the dates set forth below, in each instance in reliance upon the false appearance of legitimate market demand for those notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about the Cascade Class A-2 notes.

| Purchaser | Amount Purchased | Date Purchased |
|---|---|---|
| Teva-Hungary | $10,000,000 | 5/21/2007 |
| Teva-Iceland | $7,000,000 | 6/5/2007 |
| Teva-Iceland | $3,000,000 | 6/6/2007 |
| Teva-Hungary | $7,000,000 | 7/12/2007 |

At the time of these purchases, the actual value of these Cascade Class A-2 notes was substantially less than the price Teva paid.  Teva has placed orders to sell these securities at each

auction held since late August 2007, but those efforts have been unsuccessful.  The current fair

market value of these securities is approximately $165,000.

       E.     <u>Centre Square</u>

       93.     Merrill Lynch served as the underwriter, initial purchaser, and placement agent

for Centre Square CDO, Ltd. ("Centre Square").  Centre Square issued securities in the following

tranches:

| Class A-1 | $150,000,000.00 |
|---|---|
| Class A-2A | $97,500,000.00 |
| Class A-2B | $97,500,000.00 |
| Class A-3 | $25,000,000.00 |
| Class B | $50,000,000.00 |
| Class C | $22,000,000.00 |
| Class D | $20,000,000.00 |
| Class E | $30,000,000.00 |
| Preference Shares | $10,000,000.00 |
| **Total** | **$502,000,000.00** |

The Class A-2A tranche of Centre Square, CUSIP #156323AE7, was an auction rate security,

with the interest rate determined through monthly auctions that occurred on or about the twenty-

second day of each month.  Merrill Lynch served as the sole broker-dealer for the Centre Square

Class A-2A securities, which Merrill Lynch began selling into the marketplace on or about

November 30, 2006.

       94.     As the sole broker-dealer for the Centre Square Class A-2A notes, Merrill Lynch

deceptively and manipulatively placed bids for its own account in auctions for the Class A-2A

notes, including bids at prices in amounts that would prevent an auction from failing, bids at

rates that were intended to alter the interest rate at which an auction otherwise would have

cleared, and bids in amounts that ensured that an auction would clear in circumstances where,

Merrill Lynch knew, there was a lack of bona fide purchasers of the Centre Square Class A-2A

notes. Had Teva been aware of these deceptive and manipulative activities of Merrill Lynch, it would not have purchased the Centre Square Class A-2A notes at any price.

95.    Teva's subsidiaries purchased and sold these Centre Square Class A-2A notes on or about the dates and in the amounts set forth below, in each instance making investment decisions in reliance upon the false appearance of legitimate market demand for those notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about the Centre Square Class A-2A notes.

| Purchaser | Amount Purchased | Date Purchased | Date Sold |
|---|---|---|---|
| Teva-Iceland | $1,450,000 | 2/23/2007 | 3/23/2007 |
| Teva-Hungary | $3,525,000 | 2/23/2007 | 3/23/2007 |
| Teva-Hungary | $1,200,000 | 4/23/2007 | 5/23/2007 |

96.    Teva currently holds $26.825 million par value of Centre Square Class A-2A notes, which were purchased at par by Teva subsidiaries through an agent in the amounts and on or about the dates set forth below, in each instance in reliance upon the false appearance of legitimate market demand for those notes the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about the Centre Square Class A-2A notes.

| Purchaser | Amount Purchased | Date Purchased |
|---|---|---|
| Teva-Curacao | $3,500,000 | 6/27/2007 |
| Teva-Hungary | $10,000,000 | 6/27/2007 |
| Teva-Iceland | $10,000,000 | 7/27/2007 |
| Teva-Curacao | $3,325,000 | 8/3/2007 |

At the time of these purchasers, the actual value of these Centre Square Class A-2A notes was substantially less than the price Teva paid. Teva has placed orders to sell these securities at each

auction held since late August 2007, but those efforts have been unsuccessful.  The current fair

market value of these securities is zero.

        F.     <u>Class V</u>

        97.     Merrill Lynch served as the underwriter, initial purchaser, and placement agent

for Class V Funding II, Ltd. ("Class V").  Class V issued securities in the following tranches:

| | |
|---|---|
| Class A-1 | $68,000,000.00 |
| Class A-2A | $68,000,000.00 |
| Class A-2B | $68,000,000.00 |
| Class B | $45,000,000.00 |
| Class C | $7,000,000.00 |
| Class D | $26,000,000.00 |
| Preference Shares | $18,000,000.00 |
| **Total** | **$300,000,000.00** |

The Class A-1, Class A-2A, and Class A-2B tranches of Class V, CUSIP #18272YAA6 (A-1),

CUSIP #18272YAC2 (A-2A), and CUSIP #18272YAE8 (A-2B), were auction rate securities,

with interest rates determined through monthly auctions that occurred on or about the twenty-

third, twenty-fourth, and twenty-sixth day, respectively, of each month.  Merrill Lynch served as

the sole broker-dealer for the Class V Class A-1, Class A-2A, and Class A-2B securities, which

Merrill Lynch began selling into the marketplace on or about May 16, 2006.

        98.     As the sole broker-dealer for the Class V Class A-1, Class A-2A, and Class A-2B

notes, Merrill Lynch deceptively and manipulatively placed bids for its own account in auctions

for the Class V Class A-1, Class A-2A, and Class A-2B notes, including bids in amounts that

would prevent an auction from failing, bids at rates that were intended to alter the interest rate at

which an auction otherwise would have cleared, and bids in amounts that ensured that an auction

would clear in circumstances where, Merrill Lynch knew, there was a lack of bona fide

purchasers of the Class V Class A-1, Class A-2A, and Class A-2B notes.  Had Teva been aware

of these deceptive and manipulative activities of Merrill Lynch, it would not have purchased the Class V Class A-1, Class A-2A, and Class A-2B notes at any price.

99.    Teva Ltd. and its subsidiaries purchased and sold Class V Class A-1 and Class A-2B notes on or about the dates and in the amounts set forth below, in each instance making investment decisions in reliance upon the false appearance of legitimate market demand for those notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about the Class V Class A-1 and Class A-2B notes. Teva additionally relied on the prior representations made by Merrill Lynch about a Class V Funding CDO, its understanding that Merrill Lynch had placed its reputation behind the issuer, and the belief that Merrill Lynch would not have recommended a security in connection with which Merrill Lynch was not acting in full compliance with the law.

| Purchaser | Class of Notes | Amount Purchased | Date Purchased | Date Sold |
|---|---|---|---|---|
| Teva Ltd. | A-1 | $2,650,000 | 12/28/2006 | 1/10/2007 |
| Teva Ltd. | A-1 | $2,635,000 | 2/26/2007 | 3/26/2007 |
| Teva-Hungary | A-1 | $340,000 | 2/26/2007 | 3/26/2007 |
| Teva-Hungary | A-1 | $6,000,000 | 4/24/2007 | 5/24/2007 |
| Teva Ltd. | A-2B | $3,750,000 | 1/29/2007 | 3/27/2007 |
| Teva-Hungary | A-2B | $1,525,000 | 2/27/2007 | 5/29/2007 |
| Teva-Hungary | A-2B | $2,325,000 | 3/27/2007 | 5/29/2007 |

100.    Teva currently holds $20.25 million par value of Class V Class A-1, Class A-2A, and Class A-2B notes, which were purchased at par by Teva subsidiaries through an agent in the amounts and on or about the dates set forth below, in each instance in reliance upon the false appearance of legitimate market demand for those notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about the Class V Class A-1, Class A-2A, and Class A-2B notes.

| Purchaser | Class of Notes | Amount Purchased | Date Purchased |
|---|---|---|---|
| Teva-Curacao | A-1 | $1,900,000 | 6/26/2007 |
| Teva-Iceland | A-1 | $7,900,000 | 6/26/2007 |
| Teva-Hungary | A-1 | $5,675,000 | 7/23/2007 |
| Teva-Curacao | A-2B | $1,000,000 | 6/27/2007 |
| Teva-Hungary | A-2A | $3,775,000 | 7/24/2007 |

At the time of these purchases, the actual value of these Class V Class A-1, Class A-2A, and

Class A-2B notes was substantially less than the price Teva paid. Teva has placed orders to sell

these securities at each auction held since late August 2007, but those efforts have been

unsuccessful. The current fair market value of these securities is approximately $346,000.

      G.   <u>Dekania</u>

      101.   Merrill Lynch International served as the underwriter, initial purchaser, and

placement agent for Dekania CDO I, Ltd. ("Dekania"). Merrill Lynch served as the agent of

Merrill Lynch International for purposes of placing the securities with purchasers in the United

States and Canada. Dekania issued securities in the following tranches:

| | |
|---|---|
| Class A-1 | $120,000,000.00 |
| Class A-2 | $69,000,000.00 |
| Class B | $40,000,000.00 |
| Class C-1 | $6,000,000.00 |
| Class C-2 | $30,000,000.00 |
| Class D | $16,300,000.00 |
| Preferred Shares | $25,600,000.00 |
| **Total** | **$306,900,000.00** |

The Class B tranche of Dekania, CUSIP #244882AC0, was an auction rate security, with the

interest rate determined through monthly auctions that occurred on or about the ninth day of each

month. Merrill Lynch served as the sole broker-dealer for the Dekania Class B securities, which

Merrill Lynch International and Merrill Lynch began selling into the marketplace on or about

September 26, 2003.

102.    As the sole broker-dealer for the Dekania auction rate notes, Merrill Lynch deceptively and manipulatively placed bids for its own account in auctions for the Dekania Class B notes, including bids in amounts that would prevent an auction from failing, bids at rates that were intended to alter the interest rate at which an auction otherwise would have cleared, and bids in amounts that ensured that an auction would clear in circumstances where, Merrill Lynch knew, there was a lack of bona fide purchasers of the Dekania Class B notes.  Had Teva been aware of these deceptive and manipulative activities of Merrill Lynch and Merrill Lynch International, it would not have purchased the Dekania Class B notes at any price.

103.    Teva Ltd. purchased and sold $2.5 million of Dekania Class B notes in March 2007, making investment decisions in reliance upon the false appearance of legitimate market demand for those notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch International's material omissions about the Dekania Class B notes.

104.    Teva currently holds $5.5 million par value of Dekania Class B notes, which were purchased at par by Teva subsidiaries through an agent, in the amounts and on or about the dates set forth below, in reliance upon the false appearance of legitimate market demand for those notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's and Merrill Lynch International's material omissions about the Dekania Class B notes.  Teva additionally relied on the prior representations made by Merrill Lynch about a Dekania CDO, its understanding that Merrill Lynch had placed its reputation behind the issuer, and the belief that Merrill Lynch would not have recommended a security in connection with which Merrill Lynch was not acting in full compliance with the law.

| Purchaser | Amount Purchased | Date Purchased |
|---|---|---|
| Teva-Hungary | $2,500,000 | 3/27/2007 |
| Teva-Hungary | $3,000,000 | 7/9/2007 |

At the time of these purchases, the actual value of these Dekania Class B notes was substantially less than the price Teva paid.  Teva has placed orders to sell these securities at each auction held since late August 2007, but those efforts have been unsuccessful.  The current fair market value of these securities is approximately $777,000.

      H.     <u>Independence</u>

      105.    Merrill Lynch served as the underwriter, initial purchaser, and placement agent for Independence V CDO, Ltd. ("Independence").  Independence issued securities in the following tranches:

| Class A-1 | $396,000,000.00 |
|---|---|
| Class A-2A | $84,000,000.00 |
| Class A-2B | $15,000,000.00 |
| Class B | $56,400,000.00 |
| Class C | $26,000,000.00 |
| Preference Series 1 | $19,100,000.00 |
| Preference Series 2 | $5,500,000.00 |
| **Total** | **$602,000,000.00** |

The Class A-2A tranche of Independence, CUSIP #45343PAB1 (A-2A), was an auction rate security, with the interest rate determined through monthly auctions that occurred on or about the sixth day of each month.  Merrill Lynch served as the sole broker-dealer for the Independence Class A-2A notes, which Merrill Lynch began selling into the marketplace on or about February 25, 2004.

      106.    As the sole broker-dealer for the Independence Class A-2A notes, Merrill Lynch deceptively and manipulatively placed bids for its own account in auctions for the Class A-2A notes, including bids in amounts that would prevent an auction from failing, bids at rates that were intended to alter the interest rate at which an auction otherwise would have cleared, and

bids in amounts that ensured that an auction would clear in circumstances where, Merrill Lynch knew, there was a lack of bona fide purchasers of the Independence Class A-2A notes. Had Teva been aware of the deceptive and manipulative activities of Merrill Lynch, it would not have purchased the Independence Class A-2A notes at any price.

107. Teva subsidiaries purchased and sold Independence Class A-2A notes on or about the dates and in the amounts set forth below, in each instance making investment decisions in reliance upon the false appearance of legitimate market demand for those notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about the Independence Class A-2A notes.

| Purchaser | Amount Purchased | Date Purchased | Date Sold |
|---|---|---|---|
| Teva-Hungary | $4,000,000 | 10/7/2005 | 12/6/2005 |
| Teva-Hungary | $275,000 | 2/7/2007 | 5/15/2007 |
| Teva-Hungary | $4,725,000 | 3/7/2007 | 5/15/2007 |

108. Teva currently holds $5 million par value of Independence Class A-2A notes, which were purchased at par by Teva-Hungary through an agent on or about February 7, 2007, in reliance upon the false appearance of legitimate market demand for those notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about the Independence Class A-2A notes. At the time of these purchases, the actual value of these Independence Class A-2A notes was substantially less than the price Teva paid. Teva has placed orders to sell these securities at each auction held since late 2007, but those efforts have been unsuccessful. The current fair market value of these securities is zero.

I.    Lakeside I

109.    Merrill Lynch served as the underwriter, initial purchaser, and placement agent

for Lakeside CDO I, Ltd. ("Lakeside I").  Lakeside I issued securities in the following tranches:

| | |
|---|---|
| Class A-1 | $624,000,000.00 |
| Class A-2A | $100,000,000.00 |
| Class A-2B | $52,000,000.00 |
| Class B | $9,000,000.00 |
| Preference Shares | $15,500,000.00 |
| **Total** | **$800,500,000.00** |

The Class A-2A and Class A-2B tranches of the Lakeside I CDO, CUSIP #51210TAB1 (A-2A)

and CUSIP #51210TAG0 (A-2B), were auction rate securities, with the interest rate determined

through monthly auctions that occurred on or about the seventh and ninth day of each month.

Merrill Lynch served as the sole broker-dealer for the Lakeside I Class A-2 notes, which Merrill

Lynch began selling into the marketplace on or about January 12, 2004.

110.    As the sole broker-dealer for the Lakeside I Class A-2A and Class A-2B notes,

Merrill Lynch deceptively and manipulatively placed bids for its own account in auctions for the

Class A-2A and Class A-2B notes, including bids in amounts that would prevent an auction from

failing, bids at rates that were intended to alter the interest rate at which an auction otherwise

would have cleared, and bids in amounts that ensured that an auction would clear in

circumstances where, Merrill Lynch knew, there was a lack of bona fide purchasers of the

Lakeside I Class A-2A and Class A-2B notes.  Had Teva been aware of these deceptive and

manipulative activities of Merrill Lynch, it would not have purchased the Lakeside I Class A-2A

and Class A-2B notes at any price.

111.    Teva-Iceland purchased $4.2 million of Lakeside I Class A-2B notes on or about

March 16, 2007, which it sold on or about April 11, 2007, in reliance upon the false appearance

of legitimate market demand for those notes created by the results of prior auctions, the bidding

activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about the Class A-2B notes.

112.    Teva currently holds $4.25 million par value of Lakeside I Class A-2B notes, which were purchased at par by Teva subsidiaries through an agent, in the amounts and on or about the dates set forth below, in reliance upon the false appearance of legitimate market demand for those notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about the Lakeside I Class A-2B notes:

| Purchaser | Amount Purchased | Date Purchased |
|---|---|---|
| Teva-Iceland | $3,250,000 | 7/10/2007 |
| Teva-Hungary | $1,000,000 | 7/12/2007 |

At the time of these purchases, the actual value of those Lakeside I Class A-2B notes was substantially less than the price Teva paid.  Teva has placed orders to sell these securities at each auction held since late August 2007, but those efforts have been unsuccessful.  The current fair market value of these securities is approximately $45,000.

J.    Lakeside II

113.    Merrill Lynch served as the underwriter, initial purchaser, and placement agent for Lakeside CDO II, Ltd. ("Lakeside II").  Lakeside II issued securities in the following tranches:

| | |
|---|---|
| Class A-1 | $1,170,000,000.00 |
| Class A-2A | $150,000,000.00 |
| Class A-2B | $129,900,000.00 |
| Class B | $15,000,000.00 |
| Class C | 15,000,000.00 |
| Preference Shares | $21,600,000.00 |
| **Total** | **$1,501,500,000.00** |

The Class A-2A and Class A-2B tranches of Lakeside II, CUSIP #51210VAC4 (A-2A) and CUSIP #51210VAL4 (A-2B), were auction rate securities, with the interest rate determined through monthly auctions that occurred on or about the second and third days, respectively, of each month. Merrill Lynch served as the sole broker-dealer for the Lakeside II Class A-2 securities, which Merrill Lynch began selling into the marketplace on or about March 31, 2004.

114.    As the sole broker-dealer for the Lakeside II Class A-2A and Class A-2B notes, Merrill Lynch deceptively and manipulatively placed bids for its own account in auctions for the Class A-2A and Class A-2B notes, including bids in amounts that would prevent an auction from failing, bids at rates that were intended to alter the interest rate at which an auction otherwise would have cleared, and bids in amounts that ensured that an auction would clear in circumstances where, Merrill Lynch knew, there was a lack of bona fide purchasers of the Lakeside II Class A-2A and Class A-2B notes. Had Teva been aware of these deceptive and manipulative activities of Merrill Lynch, it would not have purchased the Lakeside II Class A-2A and Class A-2B notes at any price.

115.    Teva Ltd. and its subsidiaries purchased and sold the Lakeside II Class A-2A and Class A-2B auction rate securities in the amounts and on or about the dates set forth below, in each instance making investment decisions in reliance upon the false appearance of legitimate market demand for those notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about these securities.

| Purchaser | Class of Notes | Amount Purchased | Date Purchased | Date Sold |
|---|---|---|---|---|
| Teva-Curacao | Class A-2A | $2,000,000 | 2/3/2006 | 8/3/2006 |
| Teva-Hungary | Class A-2A | $10,000,000 | 4/3/2006 | 4/27/2006 |
| Teva-Hungary | Class A-2A | $6,350,000 | 2/5/2007 | 4/3/2007 |
| Teva Ltd. | Class A-2A | $2,350,000 | 3/5/2007 | 3/27/2007 |
| Teva-Hungary | Class A-2A | $2,700,000 | 3/5/2007 | 4/3/2007 |
| Teva-Switzerland | Class A-2A | $1,350,000 | 4/10/2007 | 6/4/2007 |
| Teva-Iceland | Class A-2A | $250,000 | 5/3/2007 | 7/3/2007 |
| Teva-Switzerland | Class A-2A | $900,000 | May 2007 | 6/4/2007 |
| Teva-Hungary | Class A-2B | $10,000,000 | 9/6/2005 | 10/4/2005 |
| Teva-Hungary | Class A-2B | $8,000,000 | 10/4/2005 | 1/4/2006 |
| Teva-Hungary | Class A-2B | $775,000 | 1/4/2007 | 2/12/2007 |
| Teva-Hungary | Class A-2B | $10,000,000 | 2/5/2007 | 2/12/2007 |
| Teva-Iceland | Class A-2B | $4,825,000 | 3/5/2007 | 3/16/2007 |
| Teva-Hungary | Class A-2B | $3,000,000 | 3/5/2007 | 4/4/2007 |
| Teva-Hungary | Class A-2B | $6,400,000 | 3/5/2007 | 7/5/2007 |
| Teva-Iceland | Class A-2B | $1,600,000 | 4/4/2007 | 5/4/2007 |
| Teva-Switzerland | Class A-2B | $8,400,000 | 4/4/2007 | May 2007 |
| Teva-Curacao | Class A-2B | $6,400,000 | 5/15/2007 | 5/21/2007 |
| Teva-Switzerland | Class A-2B | $6,400,000 | May 2007 | May 2007 |

116.    Teva currently holds $11.35 million par value of Lakeside II Class A-2A auction rate securities and $14.90 million par value of Lakeside II Class A-2B auction rate securities, which were purchased at par by Teva subsidiaries through an agent, in the amounts and on or about the dates set forth below, in each instance in reliance upon the false appearance of legitimate market demand for those notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about the Class A-2A and Class A-2B notes.

| Purchaser | Class of Notes | Amount Purchased | Date Purchased |
|---|---|---|---|
| Teva-Iceland | Class A-2A | $3,850,000 | 5/3/2007 |
| Teva-Hungary | Class A-2A | $7,500,000 | 7/3/2007 |
| Teva-Hungary | Class A-2B | $3,600,000 | 3/5/2007 |
| Teva-Iceland | Class A-2B | $2,900,000 | 4/4/2007 |
| Teva-Hungary | Class A-2B | $6,400,000 | 5/23/2007 |
| Teva-Curacao | Class A-2B | $2,000,000 | 6/27/2007 |

At the time of these purchases, the actual value of these Lakeside II Class A-2A and Class A-2B notes was substantially less than the price that Teva paid. Teva has placed orders to sell these securities at each auction held since late August 2007, but those efforts have been unsuccessful. The current fair market value of these securities is approximately $530,000.

     K.     <u>Lenox</u>

     117.     Merrill Lynch served as the underwriter, initial purchaser, and placement agent for Lenox CDO, Ltd. ("Lenox"). Lenox issued securities in the following tranches:

| | |
|---|---|
| Class A-1S | $70,000,000.00 |
| Class A-1J | $75,000,000.00 |
| Class A-2 | $2,000,000.00 |
| Class B-1 | $31,000,000.00 |
| Class B-2 | $14,000,000.00 |
| Class C | $8,000,000.00 |
| Class D | $10,000,000.00 |
| Class E-1 | $4,000,000.00 |
| Class E-2 | $16,000,000.00 |
| Preference Shares | $25,000,000.00 |
| Combination Securities | $30,000,000.00 |
| **Total** | **$285,000,000.00** |

The Class A-1S and Class A-1J tranches of the Lenox CDO, CUSIP #526257AA8 (A-1S) and CUSIP #526257AW0 (A-1J), were auction rate securities, with the interest rate determined through monthly auctions that occurred on or about the thirteenth day of each month. Merrill Lynch served as the sole broker-dealer for the Lenox Class A-1S and Class A-1J securities,

which Merrill Lynch began selling into the marketplace on or about December 6, 2005 (for the Lenox A1-J notes), and on or about April 13, 2006 (for the Lenox A1-S notes).

118.    As the sole broker-dealer for the Lenox Class A-1S and Class A-1J notes, Merrill Lynch deceptively and manipulatively placed bids for its own account in auctions for the Class A-1S and Class A-1J notes, including bids in amounts that would prevent an auction from failing, bids at rates that were intended to alter the interest rate at which an auction otherwise would have cleared, and bids in amounts that ensured that an auction would clear in circumstances where, Merrill Lynch knew, there was a lack of bona fide purchasers of the Lenox Class A-1J and Class A-1S notes.  Had Teva been aware of these deceptive and manipulative activities of Merrill Lynch, it would not have purchased the Lenox Class A-1J and Class A-1S notes.

119.    Teva-Hungary purchased $1.3 million of the Lenox Class A-1J auction rate securities on or about April 18, 2006, which it sold on or about May 15, 2006, in reliance upon the false appearance of legitimate market demand for those notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about these securities.

120.    Teva currently holds $2.75 million par value of Lenox Class A-1S notes and $8.9 million par value of Lenox Class A-1J notes, which were purchased at par by Teva subsidiaries through an agent, in the amounts and on or about the dates set forth below, in each instance in reliance upon the false appearance of legitimate market demand for those notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about the Lenox Class A-1J and Class A-1S notes.

| Purchaser | Class of Notes | Amount Purchased | Date Purchased |
|---|---|---|---|
| Teva-Curacao | Class A-1S | $2,750,000 | 7/16/2007 |
| Teva- Curacao | Class A-1J | $3,100,000 | 7/16/2007 |
| Teva-Iceland | Class A-1J | $3,600,000 | 7/16/2007 |
| Teva-Hungary | Class A-1J | $2,200,000 | 7/17/2007 |

At the time of these purchases, the actual value of these Lenox Class A-1S notes and Class A-1J notes was substantially less than the price Teva paid. Teva has placed orders to sell these securities at each auction held since late August 2007, but those efforts have been unsuccessful. The current fair market value of these securities is approximately $105,000.

    L.    Mantoloking

    121.    Merrill Lynch served as the underwriter, initial purchaser, and placement agent for Mantoloking CDO 2006-1, Ltd. ("Mantoloking"). Mantoloking issued securities in the following tranches:

| | |
|---|---|
| Class A-1 | $375,000,000.00 |
| Class A-2 | $166,250,000.00 |
| Class A-3 | $40,000,000.00 |
| Class B | $71,750,000.00 |
| Class C | $26,000,000.00 |
| Class D | $10,000,000.00 |
| Class E | $23,500,000.00 |
| Preference Shares | $52,750,000.00 |
| **Total** | **$765,250,000.00** |

The Class A-2 tranche of Mantoloking, CUSIP #564616AB6, was an auction rate security, with the interest rate determined through monthly auctions that occurred on or about the twenty-fifth day of each month. Merrill Lynch served as the sole broker-dealer for the Mantoloking Class A-2 notes, which Merrill Lynch began selling into the marketplace on or about December 5, 2006.

122.    As the sole broker-dealer for the Mantoloking Class A-2 notes, Merrill Lynch deceptively and manipulatively placed bids for its own account in auctions for the Class A-2 notes, including bids in amounts that would prevent an auction from failing, bids at rates that were intended to alter the interest rate at which an auction otherwise would have cleared, and bids in amounts that ensured that an auction would clear in circumstances where, Merrill Lynch knew, there was a lack of bona fide purchasers of the Mantoloking Class A-2 notes.  Had Teva been aware of these deceptive and manipulative activities of Merrill Lynch, it would not have purchased the Mantoloking Class A-2 notes at any price.

123.    Teva Ltd. and its subsidiaries purchased and sold Mantoloking Class A-2 notes on or about the dates and in the amounts set forth below, in each instance making investment decisions in reliance upon the false appearance of legitimate market demand for those notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about the Mantoloking Class A-2 notes.

| Purchaser | Amount Purchased | Date Purchased | Date Sold |
|---|---|---|---|
| Teva Ltd. | $3,425,000 | 1/30/2007 | 3/26/2007 |
| Teva-Curacao | $1,300,000 | 2/26/2007 | 3/26/2007 |
| Teva-Curacao | $1,400,000 | 2/26/2007 | 4/26/2007 |
| Teva Ltd. | $6,575,000 | 2/26/2007 | 3/26/2007 |
| Teva-Hungary | $10,000,000 | 2/26/2007 | 3/26/2007 |
| Teva-Hungary | $5,500,000 | 3/13/2007 | 3/26/2007 |
| Teva-Hungary | $5,825,000 | 5/29/2007 | 6/26/2007 |

124.    Teva currently holds $12.375 million par value of Mantoloking Class A-2 auction rate securities, which were purchased at par by Teva subsidiaries through an agent, in the amounts and on or about the dates set forth below, in each instance in reliance upon the false

appearance of legitimate market demand for the Class A-2 notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about the Mantoloking Class A-2 notes.

| Purchaser | Amount Purchased | Date Purchased |
|---|---|---|
| Teva-Iceland | $2,400,000 | 7/27/2007 |
| Teva-Hungary | $9,975,000 | 7/27/2007 |

At the time of these purchases, the actual value of these Mantoloking Class A-2 notes was substantially less than the price Teva paid. Teva has placed orders to sell these securities at each auction held since late August 2007, but those efforts have been unsuccessful. The current fair market value of these securities is approximately $86,000.

M.    Mercury

125.    Merrill Lynch served as the underwriter, initial purchaser, and placement agent for Mercury CDO 2004-1, Ltd. ("Mercury"). Mercury issued securities in the following tranches:

| | |
|---|---|
| Class A-1VA | $100,000.00 |
| Class A-1VB | $330,000,000.00 |
| Class A-1NV | $299,900,000.00 |
| Class A-2A | $25,000,000.00 |
| Class A-2B | $31,050,000.00 |
| Class B | $38,880,000.00 |
| Class C | $17,000,000.00 |
| Preference Shares | $11,200,000.00 |
| **Total** | **$753,130,000.00** |

The Class A-2A tranche of Mercury, CUSIP #58936RAC1 (A-2A), was an auction rate security, with the interest rate determined through monthly auctions that occurred on or about the seventh day of each month. Merrill Lynch served as the sole broker-dealer for the Mercury Class A-2A notes, which Merrill Lynch began selling into the marketplace on or about November 2, 2004.

126.    As the sole broker-dealer for the Mercury Class A-2A notes, Merrill Lynch deceptively and manipulatively placed bids for its own account in auctions for the Class A-2A notes, including bids in amounts that would prevent an auction from failing, bids at rates that were intended to alter the interest rate at which an auction otherwise would have cleared, and bids in amounts that ensured that an auction would clear in circumstances where, Merrill Lynch knew, there was a lack of bona fide purchasers of the Mercury Class A-2A notes.  Had Teva been aware of these deceptive and manipulative activities of Merrill Lynch, it would not have purchased the Mercury Class A-2A notes at any price.

127.    Teva currently holds $10 million par value of the Mercury Class A-2A notes, which were purchased at par by Teva-Hungary through an agent on or about February 7, 2007, in reliance upon the false appearance of legitimate market demand for those notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about the Class A-2A notes.  At the time of these purchases, the actual value of these Mercury Class A-2A notes was substantially less than the price Teva paid.  Teva has placed orders to sell these securities at each auction held since late August 2007, but those efforts have been unsuccessful.  The current fair market value of these securities is approximately $202,000.

N.    Pacific Bay

128.    Merrill Lynch served as the underwriter, initial purchaser, and placement agent for Pacific Bay CDO, Ltd. ("Pacific Bay").  Pacific Bay issued securities in the following tranches:

| Class A-1 | $315,000,000.00 |
|---|---|
| Class A-2 | $64,000,000.00 |
| Class B | $36,000,000.00 |
| Class C | $17,000,000.00 |
| Preference Shares | $17,000,000.00 |
| **Total** | **$449,000,000.00** |

The Class A-2 tranche of Pacific Bay, CUSIP #69403UAB7, was an auction rate security, with the interest rate determined through monthly auctions that occurred on or about the third day of each month. Merrill Lynch served as the sole broker-dealer for the Pacific Bay Class A-2 notes, which Merrill Lynch began selling into the marketplace on or about November 4, 2003.

129.    As the sole broker-dealer for the Pacific Bay Class A-2 notes, Merrill Lynch deceptively and manipulatively placed bids for its own account in auctions for the Class A-2 notes, including bids in amounts that would prevent an auction from failing, bids at rates that were intended to alter the interest rate at which an auction otherwise would have cleared, and bids in amounts that ensured that an auction would clear in circumstances where, Merrill Lynch knew, there was a lack of bona fide purchasers of the Pacific Bay Class A-2 notes. Had Teva been aware of these deceptive and manipulative activities of Merrill Lynch, it would not have purchased the Pacific Bay Class A-2 notes at any price.

130.    Teva-Hungary purchased and sold Pacific Bay Class A-2 notes on or about the dates and in the amounts set forth below, in each instance making investment decisions in reliance upon the false appearance of legitimate market demand for those notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about the Class A-2 notes.

| Purchaser | Amount Purchased | Date Purchased | Date Sold |
|---|---|---|---|
| Teva-Hungary | $2,650,000 | 2/5/2007 | 4/4/2007 |
| Teva-Hungary | $10,000,000 | 3/5/2007 | 6/12/2007 |
| Teva-Hungary | $10,000,000 | 6/4/2007 | 6/12/2007 |

131.    Teva currently holds $15 million par value of Pacific Bay Class A-2 auction rate securities, which were purchased at par by Teva subsidiaries through an agent, in the amounts and on or about the dates set forth below, in each instance in reliance upon the false appearance of legitimate market demand for those notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about the Class A-2 notes.

| Purchaser | Amount Purchased | Date Purchased |
|---|---|---|
| Teva-Iceland | $3,000,000 | 4/4/2007 |
| Teva-Iceland | $2,000,000 | 6/6/2007 |
| Teva-Hungary | $10,000,000 | 6/4/2007 |

At the time of these purchases, the actual value of these Pacific Bay Class A-2 notes was substantially less than the price Teva paid.  Teva has placed orders to sell these securities at each auction held since late August 2007, but those efforts have been unsuccessful.  The current fair market value of these securities is approximately $573,000.

O.    Port Jackson

132.    Merrill Lynch served as the underwriter, initial purchaser, and placement agent for Port Jackson CDO 2007-1, Ltd. ("Port Jackson").  Port Jackson issued securities in the following tranches:

| Class A-1 | $105,000,000.00 |
| Class A-2 | $112,500,000.00 |
| Class A-3 | $17,500,000.00 |
| Class B | $60,000,000.00 |
| Class C | $15,000,000.00 |
| Class D | $15,000,000.00 |
| Preferred Shares | $25,000,000.00 |
| **Total** | **$350,000,000.00** |

The Class A-2 tranche of Port Jackson, CUSIP #734524AB7, was an auction rate security, with the interest rate determined through quarterly auctions that occurred on or about February 22, May 22, August 22, and November 22 of each year. Merrill Lynch served as the sole broker-dealer for the Port Jackson Class A-2 securities, which Merrill Lynch began selling into the marketplace on or about January 22, 2007.

133.    As the sole broker-dealer for the Port Jackson Class A-2 notes, Merrill Lynch deceptively and manipulatively placed bids for its own account in auctions for the Class A-2 notes, including bids in amounts that would prevent an auction from failing, bids at rates that were intended to alter the interest rate at which an auction otherwise would have cleared, and bids in amounts that ensured that an auction would clear in circumstances where, Merrill Lynch knew, there was a lack of bona fide purchasers of the Port Jackson Class A-2 notes. Had Teva been aware of these deceptive and manipulative activities of Merrill Lynch, it would not have purchased the Port Jackson Class A-2 notes at any price.

134.    Teva currently holds $11.625 million par value of Port Jackson Class A-2 notes, which were purchased at par by Teva subsidiaries through an agent, in the amounts and on or about the dates set forth below, in each instance in reliance upon the false appearance of legitimate market demand for those notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about the Class A-2 notes.

| Purchaser | Amount Purchased | Date Purchased |
|---|---|---|
| Teva-Iceland | $6,025,000 | 5/23/2007 |
| Teva-Hungary | $4,875,000 | 5/23/2007 |
| Teva- Hungary | $725,000 | 5/31/2007 |

At the time of these purchases, the actual value of these Port Jackson Class A-2 notes was substantially less than the price Teva paid. Teva has placed orders to sell these securities at each auction held since late August 2007, but those efforts have been unsuccessful. The current fair market value of these securities is zero.

P.    Reservoir

135.    Merrill Lynch served as the underwriter, initial purchaser, and placement agent for Reservoir Funding Ltd. ("Reservoir"). Reservoir issued securities in the following tranches:

| | |
|---|---|
| Class A-1-V | $100,000.00 |
| Class A-1-NV | $374,900,000.00 |
| Class A-2 | $75,000,000.00 |
| Class B | $34,500,000.00 |
| Class C | $3,000,000.00 |
| Class D | $7,000,000.00 |
| Preferred Shares | $8,300,000.00 |
| Combination Securities | $4,000,000.00 |
| **Total** | **$506,800,000.00** |

The Class A-2 tranche of Reservoir, CUSIP #76112CAC2, was an auction rate security, with the interest rate determined through monthly auctions that occurred on or about the sixth day of each month. Merrill Lynch served as the sole broker-dealer for the Reservoir Class A-2 securities, which Merrill Lynch began selling into the marketplace on or about October 25, 2004.

136.    As the sole broker-dealer for the Reservoir Class A-2, Merrill Lynch deceptively and manipulatively placed bids for its own accounts in auctions for the Class A-2 notes, including bids in amounts that would prevent an auction from failing, bids at rates that were intended to alter the interest rate at which an auction otherwise would have cleared, and bids in

amounts that ensured that an auction would clear in circumstances where, Merrill Lynch knew, there was a lack of bona fide purchasers of the Reservoir Class A-2 notes. Had Teva been aware of these deceptive and manipulative activities of Merrill Lynch, it would not have purchased the Reservoir Class A-2 notes at any price.

137.    Teva Ltd. and its subsidiaries purchased and sold Reservoir Class A-2 notes on or about the dates and in the amounts set forth below, in each instance making investment decisions in reliance upon the false appearance of legitimate market demand for those notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about these securities.

| Purchaser | Amount Purchased | Date Purchased | Date Sold |
|---|---|---|---|
| Teva-Hungary | $300,000 | 10/7/2005 | 11/7/2005 |
| Teva-Hungary | $2,100,000 | 10/7/2005 | 12/6/2005 |
| Teva-Curacao | $1,300,000 | 4/26/2007 | 5/21/2007 |
| Teva-Hungary | $15,000,000 | 5/7/2007 | 5/8/2007 |
| Teva Ltd. | $800,000 | 5/25/2007 | 6/5/2007 |

138.    Teva holds $10 million of Reservoir Class A-2 notes, which were purchased at par by Teva-Hungary through an agent on or about March 7, 2007, in reliance upon the apparent legitimate market demand for the Class A-2 notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about the Class A-2 notes. At the time of these purchases, the actual value of these Reservoir Class A-2 notes was substantially less than the price Teva paid. Teva has placed orders to sell these securities at each auction held since late August 2007, but those efforts have been unsuccessful. The current fair market value of these securities is approximately $107,000.

Q.    South Coast

139.    Merrill Lynch served as the underwriter, initial purchaser, and placement agent for South Coast Funding IV Ltd. ("South Coast").  South Coast issued securities in the following tranches:

| | |
|---|---|
| Class A-1 | $690,000,000.00 |
| Class A-2 | $120,000,000.00 |
| Class B | $110,000,000.00 |
| Class C | $45,000,000.00 |
| Preference Shares | $35,000,000.00 |
| **Total** | **$1,000,000,000.00** |

The Class A-2 tranche of South Coast, CUSIP #83743TAB0, was an auction rate security, with the interest rate determined through monthly auctions that occurred on or about the fourth day of each month.  Merrill Lynch served as the sole broker-dealer for the South Coast Class A-2 securities, which Merrill Lynch began selling into the marketplace on or about December 12, 2003.

140.    As the sole broker-dealer for the South Coast auction rate notes, Merrill Lynch deceptively and manipulatively placed bids for its own account in auctions for the South Coast Class A-2 notes, including bids in amounts that would prevent an auction from failing, bids at rates that were intended to alter the interest rate at which an auction otherwise would have cleared, and bids in amounts that ensured that an auction would clear in circumstances where, Merrill Lynch knew, there was a lack of bona fide purchasers of the South Coast Class A-2 notes.  Had Teva been aware of these deceptive and manipulative activities of Merrill Lynch, it would not have purchased the South Coast Class A-2 notes at any price.

141.    Teva Ltd. and its subsidiaries purchased and sold South Coast Class A-2 notes on or about the dates and in the amounts set forth below, in each instance making investment decisions in reliance upon the false appearance of legitimate market demand for those notes

created by the results of prior auctions, the bidding activities of Merrill Lynch described in this

Amended Complaint, and Merrill Lynch's material omissions about these securities.  Teva

additionally relied on the prior representations made by Merrill Lynch about a South Coast

Funding CDO, the understanding that Merrill Lynch had placed its reputation behind the issuer,

and the belief that Merrill Lynch would not have recommended a security in connection with

which Merrill Lynch was not acting in full compliance with the law.

| Purchaser | Amount Purchased | Date Purchased | Date Sold |
|---|---|---|---|
| Teva-Hungary | $9,500,000 | 10/5/2005 | 1/5/2006 |
| Teva Ltd. | $2,500,000 | 11/8/2005 | 1/5/2006 |
| Teva-Hungary | $5,000,000 | 2/5/2007 | 5/10/2007 |
| Teva-Hungary | $5,000,000 | 2/5/2007 | 5/22/2007 |
| Teva Ltd. | $3,375,000 | 3/5/2007 | 3/27/2007 |
| Teva-Iceland | $7,000,000 | 3/22/2007 | 6/12/2007 |
| Teva-Switzerland | $2,000,000 | 4/5/2007 | 6/5/2007 |
| Teva-Switzerland | $3,375,000 | 4/10/2007 | 6/5/2007 |
| Teva-Hungary | $13,500,000 | 4/19/2007 | 5/8/2007 |
| Teva-Curacao | $550,000 | 5/8/2007 | 5/21/2007 |
| Teva-Iceland | $3,000,000 | 6/5/2007 | 6/12/2007 |
| Teva-Hungary | $4,375,000 | 6/5/2007 | 6/12/2007 |

142.    Teva holds $10 million of South Coast Class A-2 notes, which were purchased at

par by Teva subsidiaries through an agent, in the amounts and on or about the dates set forth

below, in each instance in reliance upon the false appearance of legitimate market demand for

those notes created by the results of prior auctions, the bidding activities of Merrill Lynch

described in this Amended Complaint, and Merrill Lynch's material omissions about the Class

A-2 notes.

| Purchaser | Amount Purchased | Date Purchased |
|-----------|------------------|----------------|
| Teva-Hungary | $5,625,000 | 6/5/2007 |
| Teva-Hungary | $4,375,000 | 7/3/2007 |

At the time of these purchases, the actual value of these South Coast Class A-2 notes was substantially less than the price Teva paid. Teva has placed orders to sell these securities at each auction held since late August 2007, but those efforts have been unsuccessful. The current fair market value of these securities is approximately $1,048,000.

      R.    <u>Taberna</u>

      143.    Merrill Lynch served as the underwriter, initial purchaser, and placement agent for Taberna Preferred Funding IV, Ltd. ("Taberna"). Taberna issued securities in the following tranches:

| | |
|---|---|
| Class A-1 | $313,350,000.00 |
| Class A-2 | $50,000,000.00 |
| Class A-3 | $20,000,000.00 |
| Class B-1 | $81,450,000.00 |
| Class B-2 | $7,000,000.00 |
| Class C-1 | $45,000,000.00 |
| Class C-2 | $20,000,000.00 |
| Class C-3 | $35,000,000.00 |
| Class D-1 | $21,000,000.00 |
| Class D-2 | $13,000,000.00 |
| Class E | $24,375,000.00 |
| Preferred Shares | $43,000,000.00 |
| Combination Notes | $20,000,000.00 |
| **Total** | **$693,175,000.00** |

The Class A-2 tranche of Taberna, CUSIP #87330YAC7, was an auction rate security, with the interest rate determined through monthly auctions that occurred on or about the fourth day of each month. Merrill Lynch served as the sole broker-dealer for the Taberna Class A-2 securities, which Merrill Lynch began selling into the marketplace on or about December 23, 2005.

144.    As the sole broker-dealer for the Taberna auction rate notes, Merrill Lynch deceptively and manipulatively placed bids for its own account in auctions for the Taberna Class A-2 notes, including bids in amounts that would prevent an auction from failing, bids at rates that were intended to alter the interest rate at which an auction otherwise would have cleared, and bids in amounts that ensured that an auction would clear in circumstances where, Merrill Lynch knew, there was a lack of bona fide purchasers of the Taberna Class A-2 notes.  Had Teva been aware of these deceptive and manipulative activities of Merrill Lynch, it would not have purchased the Taberna Class A-2 notes at any price.

145.    Teva Ltd. and its subsidiaries purchased and sold Taberna auction rate securities on or about the dates and in the amounts set forth below, in each instance making investment decisions in reliance upon the false appearance of legitimate market demand for those notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about these securities.

| Purchaser | Amount Purchased | Date Purchased | Date Sold |
|---|---|---|---|
| Teva Ltd. | $3,375,000 | 3/5/2007 | 6/5/2007 |
| Teva-Switzerland | $3,100,000 | 4/10/2007 | 6/5/2007 |

146.    Teva currently holds $16.9 million par value of Taberna Class A-2 notes, which were purchased at par by Teva subsidiaries through an agent, in the amounts and on or about the dates set forth below, in each instance in reliance upon the false appearance of legitimate market demand for those notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about the Class A-2 notes.

| Purchaser | Amount Purchased | Date Purchased |
|-----------|------------------|----------------|
| Teva-Hungary | $10,000,000 | 2/5/2007 |
| Teva-Curacao | $900,000 | 3/22/2007 |
| Teva-Iceland | $6,000,000 | 3/22/2007 |

At the time of these purchases, the actual value of these Taberna Class A-2 notes was substantially less than the price Teva paid. Teva has placed orders to sell these securities at each auction held since late August 2007, but those efforts have been unsuccessful. The current fair market value of these securities is approximately $838,000.

      S.      TABS

      147.     Merrill Lynch served as the underwriter, initial purchaser, and placement agent for TABS 2004-1, Ltd. ("TABS"). TABS issued securities in the following tranches:

| | |
|---|---|
| Class A-1 | $400,000,000.00 |
| Class A-2 | $60,000,000.00 |
| Class B | $25,000,000.00 |
| Class C | $3,000,000.00 |
| Class D | $5,250,000.00 |
| Preference Shares | $9,000,000.00 |
| **Total** | **$502,250,000.00** |

The Class A-2 tranche of TABS, CUSIP #87337PAC9, was an auction rate security, with the interest rate determined through monthly auctions that occurred on or about the nineteenth day of each month. Merrill Lynch served as the sole broker-dealer for the TABS Class A-2 securities, which Merrill Lynch began selling into the marketplace on or about November 30, 2004.

      148.     As the sole broker-dealer for the TABS auction rate notes, Merrill Lynch deceptively and manipulatively placed bids for its own account in auctions for the TABS Class A-2 notes, including bids in amounts that would prevent an auction from failing, bids at rates that were intended to alter the interest rate at which an auction otherwise would have cleared, and bids in amounts that ensured that an auction would clear in circumstances where, Merrill Lynch

knew, there was a lack of bona fide purchasers of the TABS Class A-2 notes.  Had Teva been

aware of these deceptive and manipulative activities of Merrill Lynch, it would not have

purchased the TABS Class A-2 notes at any price.

149.    Teva Ltd. and its subsidiaries purchased and sold TABS auction rate securities on

or about the dates and in the amounts set forth below, in each instance making investment

decisions in reliance upon the false appearance of legitimate market demand for those notes

created by the results of prior auctions, the bidding activities of Merrill Lynch described in this

Amended Complaint, and Merrill Lynch's material omissions about the TABS Class A-2 notes.

| Purchaser | Amount Purchased | Date Purchased | Date Sold |
|---|---|---|---|
| Teva-Hungary | $10,000,000 | 4/20/2006 | 6/20/2006 |
| Teva Ltd. | $2,850,000 | 12/28/2006 | 1/10/2007 |
| Teva Ltd. | $1,700,000 | 1/22/2007 | 2/20/2007 |
| Teva Ltd. | $2,500,000 | 1/22/2007 | 3/20/2007 |
| Teva Ltd. | $800,000 | 1/22/2007 | 3/27/2007 |
| Teva-Iceland | $7,000,000 | 4/20/2007 | 5/21/2007 |
| Teva-Iceland | $3,000,000 | 4/20/2007 | 6/20/2007 |
| Teva-Hungary | $10,000,000 | 4/20/2007 | 5/10/2007 |
| Teva-Curacao | $10,000,000 | 5/10/2007 | 5/21/2007 |

150.    Teva currently holds $3.6 million par value of TABS Class A-2 notes, which were

purchased at par by Teva-Curacao through an agent on or about July 24, 2007, in reliance upon

the false appearance of legitimate market demand for those notes created by the results of prior

auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and

Merrill Lynch's material omissions about the Class A-2 notes.  At the time of these purchases,

the actual value of these Class A-2 notes was substantially less than the price Teva paid.  Teva

has placed orders to sell these securities at each auction held since late August 2007, but those

efforts have been unsuccessful.  The current fair market value of these securities is approximately $34,000.

T.    <u>Vermeer I</u>

151.    Merrill Lynch served as the underwriter, initial purchaser, and placement agent for Vermeer Funding I, Ltd. ("Vermeer I").  Vermeer I issued securities in the following tranches:

| | |
|---|---:|
| Class A-1 | $245,000,000.00 |
| Class A-2 | $38,500,000.00 |
| Class B | $37,625,000.00 |
| Class C | $16,625,000.00 |
| Preference Shares | $15,750,000.00 |
| Combination Securities | $3,000,000.00 |
| **Total** | **$356,500,000.00** |

The Class A-2 tranche of Vermeer I, CUSIP #92344VAB9, was an auction rate security, with the interest rate determined through monthly auctions that occurred on or about the third day of each month.  Merrill Lynch served as broker-dealer for the Vermeer I Class A-2 securities, which Merrill Lynch began selling into the marketplace on or about April 9, 2004.

152.    As a broker-dealer for the Vermeer I auction rate notes, Merrill Lynch deceptively and manipulatively placed bids for its own account in auctions for the Vermeer I Class A-2 notes, including bids in amounts that would prevent an auction from failing, bids at rates that were intended to alter the interest rate at which an auction otherwise would have cleared, and bids in amounts that ensured that an auction would clear in circumstances where, Merrill Lynch knew, there was a lack of bona fide purchasers of the Vermeer I Class A-2 notes.  Had Teva been aware of these deceptive and manipulative activities of Merrill Lynch, it would not have purchased the Vermeer I Class A-2 notes at any price.

153.    Teva subsidiaries purchased and sold the Vermeer I Class A-2 notes on or about the dates and in the amounts set forth below, in each instance making investment decisions in reliance upon the false appearance of legitimate market demand for those notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about these securities.

| Purchaser | Amount Purchased | Date Purchased | Date Sold |
|---|---|---|---|
| Teva-Iceland | $7,000,000 | 3/22/2007 | 4/3/2007 |
| Teva-Hungary | $5,500,000 | 4/3/2007 | 7/3/2007 |
| Teva-Hungary | $1,500,000 | 5/3/2007 | 7/3/2007 |
| Teva-Curacao | $10,000,000 | 5/15/2007 | 5/21/2007 |
| Teva-Switzerland | $10,000,000 | May 2007 | May 2007 |

154.    Teva currently holds $10 million par value of Vermeer I Class A-2 notes, which were purchased at par by Teva-Hungary through an agent on or about May 23, 2007, in reliance upon the false appearance of legitimate market demand for those notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about the Class A-2 notes.  At the time of these purchases, the actual value of these Vermeer I Class A-2 notes was substantially less than the price Teva paid.  Teva has placed orders to sell these securities at each auction held since late August 2007, but those efforts have been unsuccessful.  The current fair market value of these securities is approximately $1,077,000.

U.    Vermeer II

155.    Merrill Lynch served as the underwriter, initial purchaser, and placement agent for Vermeer Funding II, Ltd. ("Vermeer II").  Vermeer II issued securities in the following tranches:

| Class A-1 | $210,000,000.00 |
|---|---|
| Class A-2A | $3,000,000.00 |
| Class A-2B | $25,250,000.00 |
| Class B | $35,290,000.00 |
| Class C-1 | $12,014,000.00 |
| Class C-2 | $2,686,000.00 |
| Preference Shares | $12,625,000.00 |
| Combination Securities | $5,311,000.00 |
| **Total** | **$306,176,00.00** |

The Class A-2B tranche of Vermeer II, CUSIP #92343AAE0 (A-2B), was an auction rate security, with the interest rate determined through monthly auctions that occurred on or about the nineteenth day of each month. Merrill Lynch served as the sole broker-dealer for the Vermeer II Class A-2B auction rate securities, which Merrill Lynch began selling into the marketplace on or about December 10, 2004.

156.    As the sole broker-dealer for the Vermeer II auction rate notes, Merrill Lynch deceptively and manipulatively placed bids for its own account in auctions for the Vermeer II Class A-2B notes, including bids in amounts that would prevent an auction from failing, bids at rates that were intended to alter the interest rate at which an auction otherwise would have cleared, and bids in amounts that ensured that an auction would clear in circumstances where, Merrill Lynch knew, there was a lack of bona fide purchasers of the Vermeer II Class A-2B notes. Had Teva been aware of these deceptive and manipulative activities of Merrill Lynch, it would not have purchased the Vermeer II Class A-2B notes at any price.

157.    Teva Ltd. and its subsidiaries purchased and sold the Vermeer II Class A-2B auction rate securities on or about the dates and in the amounts set forth below, in each instance making investment decisions in reliance upon the false appearance of legitimate market demand for those notes created by the results of prior auctions, the bidding activities of Merrill Lynch

described in this Amended Complaint, and Merrill Lynch's material omissions about these securities.

| Purchaser | Amount Purchased | Date Purchased | Date Sold |
|---|---|---|---|
| Teva Ltd. | $1,000,000 | 1/22/2007 | 3/20/2007 |
| Teva Ltd. | $4,000,000 | 1/22/2007 | 3/27/2007 |
| Teva-Hungary | $4,000,000 | 3/27/2007 | 6/20/2007 |
| Teva-Hungary | $650,000 | 4/20/2007 | 6/20/2007 |

158.    Teva currently holds $3.5 million par value of Vermeer II Class A-2B auction rate securities, which were purchased at par by Teva-Curacao through an agent on or about July 24, 2007, in reliance upon the false appearance of legitimate market demand for those notes created by the results of prior auctions, the bidding activities of Merrill Lynch described in this Amended Complaint, and Merrill Lynch's material omissions about the Class A-2B notes.  At the time of these purchases, the actual value of these Vermeer II Class A-2B notes was substantially less than the price Teva paid.  Teva has placed orders to sell these securities at each auction held since late August 2007, but those efforts have been unsuccessful.  The current fair market value of these securities is approximately $325,500.

### Counts 1-55
**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Thereunder
(Against Merrill Lynch (Counts 1-55) and Merrill Lynch International (Counts 23-24))**

159.    Paragraphs 1 through 158 above are hereby restated and incorporated by reference as if fully stated herein.

160.    At all relevant times, and in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Merrill Lynch and Merrill Lynch International directly and indirectly, by the use of the means and instrumentalities of interstate commerce and of the mails, did knowingly, intentionally, and/or recklessly use or employ, in connection with the purchase or sale of securities, a manipulative or deceptive device or contrivance in violation of Rule 10b-5 of the

Securities and Exchange Commission, 17 C.F.R. § 240.10b-5, by:  (a) employing devices,
schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to
state material facts necessary in order to make the statements made, in light of the circumstances
under which they were made, not misleading; and (c) engaging in acts, practices, and courses of
business that operated and would operate as a fraud and deceit upon Teva in connection with
Teva's purchase of the following Merrill Lynch Underwritten Securities on or about the dates set
forth below:

| Count | Plaintiff | Defendant | Issuer | Class/ Series | Amount Purchased | Date Purchased |
|---|---|---|---|---|---|---|
| 1 | Teva-Hungary | Merrill Lynch | Alesco II | A-2 | $8,000,000 | 1/30/2007 |
| 2 | Teva-Curacao | Merrill Lynch | Alesco II | A-2 | $1,400,000 | 3/27/2007 |
| 3 | Teva-Iceland | Merrill Lynch | Alesco II | A-2 | $6,175,000 | 4/30/2007 |
| 4 | Teva-Curacao | Merrill Lynch | Alesco II | A-2 | $2,300,000 | 5/15/2007 |
| 5 | Teva-Iceland | Merrill Lynch | Athilon | C | $10,000,000 | 6/20/2007 |
| 6 | Teva-Hungary | Merrill Lynch | Athilon | C | $5,100,000 | 7/10/2007 |
| 7 | Teva-Hungary | Merrill Lynch | Broderick | A-2 | $1,875,000 | 6/4/2007 |
| 8 | Teva-Hungary | Merrill Lynch | Broderick | A-2 | $3,475,000 | 6/4/2007 |
| 9 | Teva-Hungary | Merrill Lynch | Broderick | A-2 | $4,650,000 | 7/2/2007 |
| 10 | Teva-Hungary | Merrill Lynch | Cascade | A-2 | $10,000,000 | 5/21/2007 |
| 11 | Teva-Iceland | Merrill Lynch | Cascade | A-2 | $7,000,000 | 6/5/2007 |
| 12 | Teva-Iceland | Merrill Lynch | Cascade | A-2 | $3,000,000 | 6/6/2007 |
| 13 | Teva-Hungary | Merrill Lynch | Cascade | A-2 | $7,000,000 | 7/12/2007 |
| 14 | Teva-Curacao | Merrill Lynch | Centre Square | A-2A | $3,500,000 | 6/27/2007 |
| 15 | Teva-Hungary | Merrill Lynch | Centre Square | A-2A | $10,000,000 | 6/27/2007 |
| 16 | Teva-Iceland | Merrill Lynch | Centre Square | A-2A | $10,000,000 | 7/27/2007 |
| 17 | Teva-Curacao | Merrill Lynch | Centre Square | A-2A | $3,325,000 | 8/3/2007 |
| 18 | Teva-Curacao | Merrill Lynch | Class V | A-2B | $1,000,000 | 6/27/2007 |
| 19 | Teva-Hungary | Merrill Lynch | Class V | A-2A | $3,775,000 | 7/24/2007 |
| 20 | Teva-Curacao | Merrill Lynch | Class V | A-1 | $1,900,000 | 6/26/2007 |
| 21 | Teva-Iceland | Merrill Lynch | Class V | A-1 | $7,900,000 | 6/26/2007 |
| 22 | Teva-Hungary | Merrill Lynch | Class V | A-1 | $5,675,000 | 7/23/2007 |

| Count | Plaintiff | Defendant | Issuer | Class/ Series | Amount Purchased | Date Purchased |
|---|---|---|---|---|---|---|
| 23 | Teva-Hungary | Merrill Lynch, Merrill Lynch International | Dekania | B | $2,500,000 | 3/27/2007 |
| 24 | Teva-Hungary | Merrill Lynch, Merrill Lynch International | Dekania | B | $3,000,000 | 7/9/2007 |
| 25 | Teva-Hungary | Merrill Lynch | Independence | A-2A | $5,000,000 | 2/7/2007 |
| 26 | Teva-Iceland | Merrill Lynch | Lakeside I | A-2B | $3,250,000 | 7/10/2007 |
| 27 | Teva-Hungary | Merrill Lynch | Lakeside I | A-2B | $1,000,000 | 7/12/2007 |
| 28 | Teva-Iceland | Merrill Lynch | Lakeside II | A-2A | $3,850,000 | 5/3/2007 |
| 29 | Teva-Hungary | Merrill Lynch | Lakeside II | A-2A | $7,500,000 | 7/3/2007 |
| 30 | Teva-Hungary | Merrill Lynch | Lakeside II | A-2B | $3,600,000 | 3/5/2007 |
| 31 | Teva-Iceland | Merrill Lynch | Lakeside II | A-2B | $2,900,000 | 4/4/2007 |
| 32 | Teva-Hungary | Merrill Lynch | Lakeside II | A-2B | 6,400,000 | 5/23/2007 |
| 33 | Teva-Curacao | Merrill Lynch | Lakeside II | A-2B | $2,000,000 | 6/27/2007 |
| 34 | Teva-Curacao | Merrill Lynch | Lenox | A-1S | $2,750,000 | 7/16/2007 |
| 35 | Teva-Curacao | Merrill Lynch | Lenox | A-1J | $3,100,000 | 7/16/2007 |
| 36 | Teva-Iceland | Merrill Lynch | Lenox | A-1J | $3,600,000 | 7/16/2007 |
| 37 | Teva-Hungary | Merrill Lynch | Lenox | A-1J | $2,200,000 | 7/17/2007 |
| 38 | Teva-Iceland | Merrill Lynch | Mantoloking | A-2 | $2,400,000 | 7/27/2007 |
| 39 | Teva-Hungary | Merrill Lynch | Mantoloking | A-2 | $9,975,000 | 7/27/2007 |
| 40 | Teva-Hungary | Merrill Lynch | Mercury | A-2A | $10,000,000 | 2/7/2007 |
| 41 | Teva-Iceland | Merrill Lynch | Pacific Bay | A-2 | $3,000,000 | 4/4/2007 |
| 42 | Teva-Iceland | Merrill Lynch | Pacific Bay | A-2 | $2,000,000 | 6/6/2007 |
| 43 | Teva-Hungary | Merrill Lynch | Pacific Bay | A-2 | $10,000,000 | 6/4/2007 |
| 44 | Teva-Iceland | Merrill Lynch | Port Jackson | A-2 | $6,025,000 | 5/23/2007 |
| 45 | Teva-Hungary | Merrill Lynch | Port Jackson | A-2 | $4,875,000 | 5/23/2007 |
| 46 | Teva-Hungary | Merrill Lynch | Port Jackson | A-2 | $725,000 | 5/31/2007 |
| 47 | Teva-Hungary | Merrill Lynch | Reservoir | A-2 | $10,000,000 | 3/7/2007 |
| 48 | Teva-Hungary | Merrill Lynch | South Coast | A-2 | $5,625,000 | 6/5/2007 |
| 49 | Teva-Hungary | Merrill Lynch | South Coast | A-2 | $4,375,000 | 7/3/2007 |
| 50 | Teva-Hungary | Merrill Lynch | Taberna | A-2 | $10,000,000 | 2/5/2007 |
| 51 | Teva-Curacao | Merrill Lynch | Taberna | A-2 | $900,000 | 3/22/2007 |
| 52 | Teva-Iceland | Merrill Lynch | Taberna | A-2 | $6,000,000 | 3/22/2007 |
| 53 | Teva-Curacao | Merrill Lynch | TABS | A-2 | $3,600,000 | 7/24/2007 |
| 54 | Teva-Hungary | Merrill Lynch | Vermeer I | A-2 | $10,000,000 | 5/23/2007 |
| 55 | Teva-Curacao | Merrill Lynch | Vermeer II | A-2B | $3,500,000 | 7/24/2007 |

161.    As described above, among the manipulative and deceptive devices used and employed by Merrill Lynch (for itself and as agent for Merrill Lynch International) were secretly entering bids for its own account in auctions for the Merrill Lynch Underwritten Securities in order, among other things, to create a false appearance of liquidity and demand for these securities, to prevent auction failures, to control the rates at which the auctions cleared, and to encourage holders of the Merrill Lynch Underwritten Securities not to sell these securities.  At all relevant times, Merrill Lynch knew (or was reckless in not knowing) that its conduct deceived Teva and other buyers and holders of the Merrill Lynch Underwritten Securities.

162.    At all times relevant to this Amended Complaint, Merrill Lynch and Merrill Lynch International knowingly, intentionally, and/or recklessly omitted material information regarding the risks, nature, and characteristics of the Merrill Lynch Underwritten Securities. Merrill Lynch and Merrill Lynch International were in possession of adverse material, non-public information concerning the Merrill Lynch Underwritten Securities, but knowingly or recklessly concealed such information from Teva and the investing public.

163.    Merrill Lynch and Merrill Lynch International used, directly and indirectly, the means and instrumentalities of interstate commerce in furtherance of the deceptive and manipulative devices and contrivances described in this Amended Complaint by, other things, receiving and transmitting bid information, and purchase and sale confirmations, for the Merrill Lynch Underwritten Securities, to and from Teva's agent, via telephone, facsimile, e-mail, instant messaging, and/or the mails; and distributing copies of offering statements, auction rate supplements, and private placement memoranda via e-mail and the mails.

164.    In making decisions to invest in the Merrill Lynch Underwritten Securities, Teva and its subsidiaries relied on, among other things, the deceptive and manipulative devices and

contrivances employed by Merrill Lynch and Merrill Lynch International as described in this Amended Complaint, including material omissions about the extent to which there was sufficient legitimate market demand for the Merrill Lynch Underwritten Securities to provide liquidity, and that auctions for these securities resulted in the determination of interest rates based on the natural interplay of supply and demand. Teva relied to its detriment on the false appearance of liquidity generated by Merrill Lynch's and Merrill Lynch International's activities.

165.    In making its decision to purchase approximately $273 million in aggregate par value of the Merrill Lynch Underwritten Securities, Teva justifiably relied on the appearance of an efficient market created through Merrill Lynch's and Merrill Lynch International's use of the deceptive and manipulative devices and contrivances described in this Amended Complaint, and on the integrity of the marketplace and the auction process for the Merrill Lynch Underwritten Securities. Indeed, in reliance on those manipulative devices and contrivances, Teva purchased and sold the Merrill Lynch Underwritten Securities on numerous occasions before auctions for those securities began to fail after Merrill Lynch's capital constraints forced it to discontinue its activities in auctions for the Merrill Lynch Underwritten Securities. Had Teva known about Merrill Lynch's activities in auctions for the Merrill Lynch Underwritten Securities, and the lack of third-party demand for those securities, it would not have purchased the Merrill Lynch Underwritten Securities at any price.

166.    Teva has suffered substantial damages as a result of Merrill Lynch's and Merrill Lynch International's manipulative, deceptive, and fraudulent conduct. Teva purchased securities that it never would have acquired absent Merrill Lynch's and Merrill Lynch International's activities, and it purchased the Merrill Lynch Underwritten Securities at par when, at the time, the actual value of those securities was a small fraction of their par value.

Teva additionally has been deprived of funds equivalent to the par value of the approximately $273 million that it invested in the Merrill Lynch Underwritten Securities, which Teva believed it could sell on short notice, at par, through the auction process.

**Count 56**
**For Violations of Section 20(a) of the Exchange Act**
**(against Merrill Lynch & Co.)**

167.    Paragraphs 1 through 166 above are hereby restated and incorporated by reference as if fully stated herein.

168.    At all times relevant to this Amended Complaint, Merrill Lynch & Co. acted as a control person of Merrill Lynch and Merrill Lynch International with respect to all of the acts described herein.  By virtue of its position as the 100 percent shareholder of Merrill Lynch (directly) and Merrill Lynch International (indirectly), its supervisory authority over all aspects of the business of Merrill Lynch and Merrill Lynch International, and the principal officers and directors that it shares with Merrill Lynch, Defendant Merrill Lynch & Co. directed, participated in, and/or had knowledge that, in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Merrill Lynch and Merrill Lynch International, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and of the mails, did knowingly, intentionally, and/or recklessly use or employ, in connection with the purchase or sale of securities, a manipulative or deceptive device or contrivance in violation of Rule 10b-5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5, by:  (i) employing devices, schemes, and artifices to defraud Teva; (ii) making untrue statements of material fact and/or omitting material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (iii) engaging in acts, practices, and courses of business that operated as a fraud and deceit upon Teva in connection with Teva's

purchase of the Merrill Lynch Underwritten Securities.  Merrill Lynch & Co. had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Merrill Lynch and Merrill Lynch International, including the statements and the conduct described herein.

169.    Merrill Lynch & Co. had operational control, operational management, and supervisory involvement over the day-to-day operations of Merrill Lynch and Merrill Lynch International and, therefore, had the power to direct and/or influence the particular conduct, materials, representations, omissions, and transactions giving rise to the securities violations alleged herein.

170.    Merrill Lynch & Co. had the authority and the ability to prevent the material omissions alleged herein, but did not do so because the fraud enabled Merrill Lynch & Co. to earn extraordinary profits and to avoid taking a substantial write-down on the mark-to-market value of Merrill Lynch's and Merrill Lynch International's multi-billion portfolio of CDO notes, including the Merrill Lynch Underwritten Securities, that would have had a material negative impact on Merrill Lynch & Co.'s current periodic income statement and would have resulted in a significant drop in the market price of Merrill Lynch & Co.'s common stock.

171.    Merrill Lynch and Merrill Lynch International violated Section 10(b) and SEC Rule 10b-5 by the misrepresentations, acts, and omissions alleged in paragraphs 159 through 166.  By virtue of its position as a control person, Merrill Lynch & Co. is jointly and severally liable for those violations of the Exchange Act.

### Count 57-111
### Common Law Fraud
### (Merrill Lynch (Counts 57-111) and Merrill Lynch International (Counts 79-80))

172.    Paragraphs 1 through 171 above are hereby restated and incorporated by reference as if fully stated herein.

173.    Teva and its subsidiaries purchased the Merrill Lynch Underwritten Securities on

or about the dates and in the amounts set forth below:

| Count | Plaintiff | Defendant | Issuer | Class/ Series | Amount Purchased | Date Purchased |
|---|---|---|---|---|---|---|
| 57 | Teva-Hungary | Merrill Lynch | Alesco II | A-2 | $8,000,000 | 1/30/2007 |
| 58 | Teva-Curacao | Merrill Lynch | Alesco II | A-2 | $1,400,000 | 3/27/2007 |
| 59 | Teva-Iceland | Merrill Lynch | Alesco II | A-2 | $6,175,000 | 4/30/2007 |
| 60 | Teva-Curacao | Merrill Lynch | Alesco II | A-2 | $2,300,000 | 5/15/2007 |
| 61 | Teva-Iceland | Merrill Lynch | Athilon | C | $10,000,000 | 6/20/2007 |
| 62 | Teva-Hungary | Merrill Lynch | Athilon | C | $5,100,000 | 7/10/2007 |
| 63 | Teva-Hungary | Merrill Lynch | Broderick | A-2 | $1,875,000 | 6/4/2007 |
| 64 | Teva-Hungary | Merrill Lynch | Broderick | A-2 | $3,475,000 | 6/4/2007 |
| 65 | Teva-Hungary | Merrill Lynch | Broderick | A-2 | $4,650,000 | 7/2/2007 |
| 66 | Teva-Hungary | Merrill Lynch | Cascade | A-2 | $10,000,000 | 5/21/2007 |
| 67 | Teva-Iceland | Merrill Lynch | Cascade | A-2 | $7,000,000 | 6/5/2007 |
| 68 | Teva-Iceland | Merrill Lynch | Cascade | A-2 | $3,000,000 | 6/6/2007 |
| 69 | Teva-Hungary | Merrill Lynch | Cascade | A-2 | $7,000,000 | 7/12/2007 |
| 70 | Teva-Curacao | Merrill Lynch | Centre Square | A-2A | $3,500,000 | 6/27/2007 |
| 71 | Teva-Hungary | Merrill Lynch | Centre Square | A-2A | $10,000,000 | 6/27/2007 |
| 72 | Teva-Iceland | Merrill Lynch | Centre Square | A-2A | $10,000,000 | 7/27/2007 |
| 73 | Teva-Curacao | Merrill Lynch | Centre Square | A-2A | $3,325,000 | 8/3/2007 |
| 74 | Teva-Curacao | Merrill Lynch | Class V | A-2B | $1,000,000 | 6/27/2007 |
| 75 | Teva-Hungary | Merrill Lynch | Class V | A-2A | $3,775,000 | 7/24/2007 |
| 76 | Teva-Curacao | Merrill Lynch | Class V | A-1 | $1,900,000 | 6/26/2007 |
| 77 | Teva-Iceland | Merrill Lynch | Class V | A-1 | $7,900,000 | 6/26/2007 |
| 78 | Teva-Hungary | Merrill Lynch | Class V | A-1 | $5,675,000 | 7/23/2007 |
| 79 | Teva-Hungary | Merrill Lynch, Merrill Lynch International | Dekania | B | $2,500,000 | 3/27/2007 |
| 80 | Teva-Hungary | Merrill Lynch, Merrill Lynch International | Dekania | B | $3,000,000 | 7/9/2007 |
| 81 | Teva-Hungary | Merrill Lynch | Independence | A-2A | $5,000,000 | 2/7/2007 |
| 82 | Teva-Iceland | Merrill Lynch | Lakeside I | A-2B | $3,250,000 | 7/10/2007 |
| 83 | Teva-Hungary | Merrill Lynch | Lakeside I | A-2B | $1,000,000 | 7/12/2007 |

80

| Count | Plaintiff | Defendant | Issuer | Class/ Series | Amount Purchased | Date Purchased |
|---|---|---|---|---|---|---|
| 84 | Teva-Iceland | Merrill Lynch | Lakeside II | A-2A | $3,850,000 | 5/3/2007 |
| 85 | Teva-Hungary | Merrill Lynch | Lakeside II | A-2A | $7,500,000 | 7/3/2007 |
| 86 | Teva-Hungary | Merrill Lynch | Lakeside II | A-2B | $3,600,000 | 3/5/2007 |
| 87 | Teva-Iceland | Merrill Lynch | Lakeside II | A-2B | $2,900,000 | 4/4/2007 |
| 88 | Teva-Hungary | Merrill Lynch | Lakeside II | A-2B | $6,400,000 | 5/23/2007 |
| 89 | Teva-Curacao | Merrill Lynch | Lakeside II | A-2B | $2,000,000 | 6/27/2007 |
| 90 | Teva-Curacao | Merrill Lynch | Lenox | A-1S | $2,750,000 | 7/16/2007 |
| 91 | Teva-Curacao | Merrill Lynch | Lenox | A-1J | $3,100,000 | 7/16/2007 |
| 92 | Teva-Iceland | Merrill Lynch | Lenox | A-1J | $3,600,000 | 7/16/2007 |
| 93 | Teva-Hungary | Merrill Lynch | Lenox | A-1J | $2,200,000 | 7/17/2007 |
| 94 | Teva-Iceland | Merrill Lynch | Mantoloking | A-2 | $2,400,000 | 7/27/2007 |
| 95 | Teva-Hungary | Merrill Lynch | Mantoloking | A-2 | $9,975,000 | 7/27/2007 |
| 96 | Teva-Hungary | Merrill Lynch | Mercury | A-2A | $10,000,000 | 2/7/2007 |
| 97 | Teva-Iceland | Merrill Lynch | Pacific Bay | A-2 | $3,000,000 | 4/4/2007 |
| 98 | Teva-Iceland | Merrill Lynch | Pacific Bay | A-2 | $2,000,000 | 6/6/2007 |
| 99 | Teva-Hungary | Merrill Lynch | Pacific Bay | A-2 | $10,000,000 | 6/4/2007 |
| 100 | Teva-Iceland | Merrill Lynch | Port Jackson | A-2 | $6,025,000 | 5/23/2007 |
| 101 | Teva-Hungary | Merrill Lynch | Port Jackson | A-2 | $4,875,000 | 5/23/2007 |
| 102 | Teva-Hungary | Merrill Lynch | Port Jackson | A-2 | $725,000 | 5/31/2007 |
| 103 | Teva-Hungary | Merrill Lynch | Reservoir | A-2 | $10,000,000 | 3/7/2007 |
| 104 | Teva-Hungary | Merrill Lynch | South Coast | A-2 | $5,625,000 | 6/5/2007 |
| 105 | Teva-Hungary | Merrill Lynch | South Coast | A-2 | $4,375,000 | 7/3/2007 |
| 106 | Teva-Hungary | Merrill Lynch | Taberna | A-2 | $10,000,000 | 2/5/2007 |
| 107 | Teva-Curacao | Merrill Lynch | Taberna | A-2 | $900,000 | 3/22/2007 |
| 108 | Teva-Iceland | Merrill Lynch | Taberna | A-2 | $6,000,000 | 3/22/2007 |
| 109 | Teva-Curacao | Merrill Lynch | TABS | A-2 | $3,600,000 | 7/24/2007 |
| 110 | Teva-Hungary | Merrill Lynch | Vermeer I | A-2 | $10,000,000 | 5/23/2007 |
| 111 | Teva-Curacao | Merrill Lynch | Vermeer II | A-2B | $3,500,000 | 7/24/2007 |

174.    In connection with the Merrill Lynch Underwritten Securities, Merrill Lynch and

Merrill Lynch International distributed offering statements, auction rate supplements, and private

placement memoranda that Merrill Lynch and Merrill Lynch International knew, or were

reckless in not knowing, contained untrue statements of material facts and failed to disclose other

material facts that needed to be disclosed in order to make Merrill Lynch's and Merrill Lynch

International's statements, in light of the circumstances under which they were made, not misleading, as described above.

175.    With every bid that Merrill Lynch submitted for its own account in an auction for the Merrill Lynch Underwritten Securities, Merrill Lynch falsely represented to the marketplace and to actual and prospective investors, including Teva, that there was sufficient legitimate demand in the auctions for the Merrill Lynch Underwritten Securities (other than from bids placed on behalf of Merrill Lynch's proprietary trading accounts) for each auction to clear and, therefore, significant liquidity in the market for these securities.  Merrill Lynch and Merrill Lynch International omitted material information concerning Merrill Lynch's activities in the auctions for the Merrill Lynch Underwritten Securities, as described above.  Because Teva had previously participated in auctions for the Merrill Lynch Underwritten Securities that were manipulated as described in this Amended Complaint, Teva believed in the appearance of demand for the Merrill Lynch Underwritten Securities, and the overall liquidity of those securities, that was created as a result of Merrill Lynch's deceptive, manipulative, and fraudulent conduct.

176.    Merrill Lynch and Merrill Lynch International communicated materially false and misleading information concerning the Merrill Lynch Underwritten Securities to other investment banks and broker-dealers, with the knowledge and intent that they communicate this same information to customers such as Teva.  Merrill Lynch and Merrill Lynch International represented that there was a vibrant and efficient liquid market for auction rate securities in general, and the Merrill Lynch Underwritten Securities in particular.  These misrepresentations concerning the safety and security of auction rate securities were repeated to Teva.

177.    Merrill Lynch's and Merrill Lynch International's material misrepresentations and omissions were made with the purpose of inducing prospective investors, including Teva, to purchase and hold the Merrill Lynch Underwritten Securities.

178.    In justifiable reliance upon Merrill Lynch's and Merrill Lynch International's material misrepresentations and omissions and upon the integrity of the market, and without knowledge of the truth, Teva purchased approximately $273 million par value of the Merrill Lynch Underwritten Securities.  Had Teva known that the information provided and the statements made by Merrill Lynch and Merrill Lynch International contained material misrepresentations and omissions, had Teva been aware of the material information that Merrill Lynch and Merrill Lynch International concealed, or had Teva known the true nature and the extent of Merrill Lynch's undisclosed bidding in auctions for the Merrill Lynch Underwritten Securities, Teva would not have acquired the Merrill Lynch Underwritten Securities at any price. Moreover, had Merrill Lynch or Merrill Lynch International disclosed the material omitted information at the time that they underwrote the Merrill Lynch Underwritten Securities, or at the time of Teva's purchases, the fair market value for those securities would have been only a small fraction of the price that Teva paid.

179.    As a direct and proximate result of Merrill Lynch's and Merrill Lynch International's materially misleading statements and omissions, Teva has suffered, and continues to suffer, damages.


WHEREFORE, Plaintiff Teva prays for relief and judgment, as follows:

A.    Compensatory damages in an amount to be determined at trial;

B.    Rescission of Teva's purchase of the Merrill Lynch Underwritten Securities;

   C.  Disgorgement of all fees, commissions, or other income, compensation, or value received by Merrill Lynch and Merrill Lynch International in connection with the Merrill Lynch Underwritten Securities, including but not limited to any underwriting fees and any commission earned by Merrill Lynch in its capacity as broker-dealer for the auctions;

   D.  Punitive damages in an amount to be determined at trial;

   E.  An award of all of Teva's costs, expenses, and disbursements in prosecuting this action, including attorneys' and expert fees; and

   F.  Such other relief as the Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff Teva demands a jury trial on all issues so triable.

Dated:  November 5, 2009

Respectfully submitted,

*David Schwarz*

REID M. FIGEL (SDNY Bar No. RF 8663)
DAVID L. SCHWARZ (*pro hac vice*)
ANDREW C. SHEN (*pro hac vice*)
KELLOGG, HUBER, HANSEN, TODD,
   EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999
rfigel@khhte.com

*Counsel for Teva Pharmaceutical Industries Ltd.,*
*Teva Pharmaceutical Works Private Limited Company,*
*and Teva Pharmaceuticals Curacao NV*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 5th day of November 2009, a true and correct copy of the

foregoing First Amended Complaint was served on Counsel of Record *via* overnight mail upon

the following:

Barry J. Mandel
Foley & Lardner LLP
90 Park Avenue
New York, NY 10016
*Attorney for Merrill Lynch & Co., Inc.;*
*Merrill Lynch, Pierce, Fenner & Smith Inc.;*
*and Merrill Lynch International*


_____
Andrew Kizzie